## ROLATER v. STRAIN.

No. 2801.    Opinion Filed November 11, 1913.

(137 Pac. 96.)

1. **ASSAULT AND BATTERY—Civil Assault—Proof Required—Surgical Operation.** In a civil action by a patient against a surgeon for assault and battery, it is not necessary to show that the surgeon intended, by the act complained of, to injure the patient. It is sufficient if it appears that the act was wrongful and unlawful.

2. **PHYSICIANS AND SURGEONS — Right to Operate — Consent.** Consent of the patient, either expressed or implied, is necessary to authorize a physician to perform a surgical operation upon the body of the patient. An operation without such consent is wrongful and unlawful, and renders the surgeon liable in damages. Consent may be implied from circumstances.

3. **ASSAULT AND BATTERY — Physicians and Surgeons — Operation—Liability for Damages—Question for Jury.** The plaintiff in error advised an operation upon the great toe of the defendant in error's right foot. She consented to the operation upon the express agreement that no bones should be removed. She was placed under an anaesthetic, and the operation performed, and in performing the operation a sesamoid bone was removed. Contending that she did not consent to the removal of the sesamoid bone, and that its removal was wrongful and unlawful, and that her foot was permanently injured by reason of the removal of this bone, she brought this action for assault and battery. It is **held:**

(a)   That the plaintiff in error had no authority to remove a sesamoid bone from the defendant in error's foot without her consent, either expressed or implied.

(b)   That she did not expressly consent, and whether or not her consent was implied from the circumstances was a question for the jury to determine under all the evidence.

(c)   That, if the defendant in error did not consent, the removal of this sesamoid bone from her foot was wrongful and unlawful, and constitutes in law a trespass upon her person, and a technical assault and battery.

(Syllabus by Galbraith, C.)

*Error from District Court, Oklahoma County;*
*Geo. W. Clark, Judge.*

Action by Mattie Inez Strain against J. B. Rolater.   Judgment for plaintiff, and defendant brings error.   Affirmed.

*Flynn, Chambers, Lowe & Richardson,* for plaintiff in error.

*E. G. McAdams* and *A. F. Moss,* for defendant in error.

Opinion by GALBRAITH, C.   This is an appeal from a judgment of the district court of Oklahoma county, rendered upon the verdict of a jury in favor of the defendant in error, and against the plaintiff in error, for $1,000, in an action for trespass to the person.

The plaintiff in error is a physician and surgeon in Oklahoma City, and, at the time of the wrong charged, owned and was conducting a sanitarium at Fourth and Stiles streets.   The defendant in error, a young lady, was in the employ of the Pioneer Telephone & Telegraph Company, and on February 7, 1908, when passing from the building of the company where she was employed, stepped upon a nail which penetrated the great toe of her right foot.   Inflammation set in, and the wound not having healed, some 60 days after the injury, the Pioneer Telephone & Telegraph Company caused the plaintiff in error to make an examination of the injured foot.   He advised that an operation was necessary to effect a cure, and that the operation should be made by making an incision in the foot or toe so as to drain the joint and remove any foreign matter that might be found therein.   It was agreed that the operation might be made, and the defendant in error was removed to the hospital of the plain-

tiff in error, an anaesthetic administered, and the operation performed. In performing the operation a sesamoid bone was removed. The cause of action is based on the removal of this sesamoid bone. It is not claimed that the operation was unskillfully performed, but that the plaintiff in error had agreed before the operation that he would not remove any bones from the foot, and that the removal of this sesamoid bone was without the authority or consent of the patient, and constituted a trespass upon her person, and a technical assault and battery.

The petition, so far as material, averred that the defendant in error consented to the operation upon the express condition that no bone should be removed from her foot, and that the removal of this sesamoid bone was without her consent, or the consent of any one authorized to act for her, and was wrongful, and that the foot had been permanently injured, and that she had suffered great pain and distress of both body and mind by reason thereof. The plaintiff in error interposed a general denial, and during the course of the trial, by consent of the court, amended his answer setting out "that he was employed as her physician to drain the first joint of the large toe on the right foot; that at the time the said joint was infected, and it was necessary that the same be drained; that, in compliance with said employment, he made an incision into said toe; that, before reaching the joint so as to drain the same, he found it covered with a sesamoid bone which rendered it impossible to drain the joint without the removal of said sesamoid bone; that the said sesamoid bone was in an unusual place and its presence could not be ascertained by an examination; that, had said sesamoid bone not been removed and the joint properly drained, serious results would have followed; that the removal was necessary to effect a cure; that said sesamoid bone is not considered one of the bones of the human anatomy, and was not within the contemplation of the parties at the time said defendant consented to the operation." To this amended answer a general denial was filed.

It is not denied that this bone was removed, and it is not contended that the defendant in error consented to its removal.

The plaintiff in error denies that he undertook the operation with the understanding that no bones were to be removed, but the defendant in error testifies that such was the agreement, and in this she is supported by the testimony of her mother and a sister.    This evidence was sufficient to take this question to the jury.    It is argued by the plaintiff in error that, even if the contract was made as contended, the sesamoid bone was not within the contemplation of the parties, and that its removal, under the circumstances disclosed by the evidence, was not a violation of the terms of the agreement, and that the jury should have been instructed to bring in a verdict for the plaintiff in error. ·

This case presents questions that are new, if not novel, not only in this jurisdiction, but there are few cases to be found anywhere on the questions presented here.

In discussing the case of *Pratt v. Davis,* from the Court of Appeals of Illinois (118 Ill. App. 166), it was said in 37 Chicago Legal News, p. 213:

"Under a free government at least, the free citizen's first and greatest right, which underlies all others—the right to the inviolability of his person, in other words, his right to himself—is the subject of universal acquiescence, and this right necessarily forbids a physician or surgeon, however skillful or eminent, who has been asked to examine, diagnose, advise and prescribe (which are at least necessary first steps in treatment and care), to violate without permission the bodily integrity of his patient by a major or capital operation, placing him under an anaesthetic for that purpose, and operating on him without his consent or knowledge."

In *Mohr v. Williams,* 95 Minn. 261, 104 N. W. 12, 1 L. R. A. (N. S.) 439, 111 Am. St. Rep. 462, 5 Am. Cas. 303, involving the same principle as the case at bar, concerning the right to make this kind of contract, the court, after quoting from 1 Kinkead, Torts, sec. 375:

"The patient must be the final arbiter as to whether he will take his chances with the operation, or take his chances of living without it.    Such is the natural right of the individual, which the law recognizes as a legal right.    Consent, therefore, of an

individual must be either expressly or impliedly given before a surgeon may have the right to operate."
—said:

"There is logic in the principle thus stated, for, in all other trades, professions, or occupations, contracts are entered into by the mutual agreement of the interested parties, and are required to be performed in accordance with their letter and spirit. No reason occurs to us why the same rule should not apply between the physician and patient. If the physician advises his patient to submit to a particular operation, and the patient weighs the dangers and risks incident to its performance, and he finally consents, he thereby, in effect, enters into a contract authorizing his physician to operate to the extent of the consent given, but no further."

An attempt is made in the brief to distinguish *Mohr v. Williams* from the case at bar, inasmuch as in that case the patient consented to an operation on the left ear, and it was performed on the right ear, while in this, the consent was to the operation upon the right foot, where it was performed. However, the operation was not performed in the manner agreed upon and in the manner consented to by the patient, and, as a matter of fact, the actual operation performed was without her consent. There can be no real distinction between the cases in principle. The same rule of law is applicable to each. It follows from this authority and upon reason and principle that if the contract was made between the patient and surgeon, that the patient had the right to insist upon a strict performance of it, that the removal of the sesamoid bone by the surgeon was without the consent of the patient, and was therefore unlawful and wrongful, and constituted a trespass upon her person.

It is argued with earnestness that the sesamoid bone is not one of the bones of the human anatomy, inasmuch as the recognized authorities on anatomy, in naming and numbering the bones of the human body, do not include the sesamoid bone, and therefore the sesamoid bone was not within the contemplation of the parties at the time of making the agreement, and that its removal would not be a violation of the terms of the agreement, in any event. This argument overlooks the pertinent facts that it does not appear from the record that the defendant in error

was conversant with anatomy or knew the names of the bones in her foot, and that it does appear that she knew there were bones there, and that she wanted to retain all of them, and was not willing that any of them, whatever its name, should be removed, and that she consented to the operation upon the express condition that no bones should be removed. The expert witnesses all agreed that the sesamoid bone was a bone and was found in the human foot, but that its exact location varied in different persons. We cannot say, as a matter of law, that the sesamoid bone was not within the contemplation of the parties at the time consent was given to the operation. This question was properly submitted to the jury for determination.

Again, it is contended by the plaintiff in error, even if the contract was made, that the removal of the bone, under the circumstances, was not a violation of it, since the facts show this to be an emergency case, as this bone was found in an unusual place, and was unexpected, and when it was discovered, the patient being under the influence of the anaesthetic, it was unsafe to stop the operation at that time and allow her to come out from under the influence of the anaesthetic so as to have obtained her consent to its removal, and that he was justified under the circumstances in removing the bone. In answer to this argument, the Supreme Court of Minnesota, in *Mohr v. Williams, supra,* said:

"The medical profession has made signal progress in solving the problems of health and disease, and they may justly point with pride to the advancements made in supplementing nature and correcting deformities, and relieving pain and suffering. The physician impliedly contracts that he possesses, and will exercise in the treatment of patients, skill and learning, and that he will exercise reasonable care and exert his best judgment to bring about favorable results. The methods of treatment are committed almost exclusively to his judgment, but we are aware of no rule or principle of law which would extend to him free license respecting surgical operations. Reasonable latitude must, however, be allowed the physician in a particular case; and we would not lay down any rule which would unreasonably interfere with the exercise of his discretion, or prevent him from taking such measures as his judgment dictated for the welfare

of the patient in a case of emergency. If a person should be injured to the extent of rendering him unconscious, and his injuries were of such a nature as to require prompt surgical attention, a physician called to attend him would be justified in applying such medical or surgical treatment as might reasonably be necessary for the preservation of his life or limb, and consent on the part of the injured person would be implied. And again, if, in the course of an operation to which the patient consented, the physician should discover conditions not anticipated before the operation was commenced, and which, if not removed, would endanger the life or health of the patient, he would, though no express consent was obtained or given, be justified in extending the operation to remove and overcome them."

It does not appear from the record that the operation in this case was of such a character as to bring it within the rule last above named by the Supreme Court of Minnesota. The operation itself was not designated by any of the expert witnesses as a major operation. It was represented by the plaintiff in error that it was of slight consequence, and that it would not be necessary for the patient to remain in his hospital over 24 or 48 hours at the outside, and he testified, as to the time taken to perform the operation, that "I suppose the time I occupied in doing that was possibly 15 or 20 minutes, the actual work that completed the operation." We would not hold under this evidence, as a matter of law, that there was such an emergency existing as authorized the surgeon to proceed in this operation, after the discovery of this bone in an unusual and unexpected place, as to authorize him to remove it without the consent of the patient. As to whether or not such an emergency existed was a question of fact under the evidence for the jury. If the jury found that the necessity which authorized the surgeon to proceed to remove this bone without the consent did not exist, then his doing so was wrongful and unlawful, and he is liable for whatever injury resulted to the patient from such unauthorized act. See, also, *Pratt v. Davis*, 224 Ill. 300, 309, 310, 79 N. E. 562, 7 L. R. A. (N. S.) 609, 8 Ann. Cas. 197.

The Civil Court of Appeals of Texas, in an opinion handed down May 28, 1913, said, relative to the rule of law under consideration:

"The law, as enunciated by the few courts which have passed thereon, is not as clear and satisfactory as it should be in cases of this character, but it seems to be reasonably established that a physician is liable for operating upon a patient unless he obtains the consent of the patient, if competent, and if not, of some one, who, under the circumstances, would be legally authorized to give the requisite consent. Of course, consent may be presumed from circumstances, without direct proof, but there must be consent in every case, except in an emergency when to delay to obtain consent would endanger the life or health of the patient." (*Rishworth v. Moss*, 159 S. W. 122, at 124.)

Again, it is contended that the judgment cannot be sustained for any more than nominal damages, since there is no testimony that any actual injury resulted to the defendant in error from the removal of this bone. The plaintiff in error testified that this sesamoid bone was wedged in the joint, and that when he made the incision and discovered the bone he knew it would be impossible to drain the joint without its removal, and it was necessary to drain the joint in order to effect a cure, and "after my incision down to the bone, I merely took a pair of scissors and cut closely around the bone and removed it in that way." All the other expert witnesses testified that in all their experience they had never found a sesamoid bone in the position that the plaintiff in error testified it was in this patient. However, they were unanimous in their opinion that this sesamoid bone did not serve any useful purpose in the foot, and its removal would not cause injury. As we understand, the value of expert testimony and the weight of it depends upon the experience and ability and the extent of the witness' opportunity for observing the result of similar cases under like conditions. Where the evidence shows, as in this case, that the expert never observed a similar condition, it seems that his opinion as to the effect of removing the bone, in the case at bar, might have had little probative force with the jury. In any event, the jury were not compelled to believe this testimony. Being com-

posed of men of ordinary intelligence, they may have consulted their common experience, and reached the conclusion that every bone in the human body serves some useful purpose, and that the sesamoid bone in the plaintiff's foot served a purpose, and its removal might have resulted in injury, the testimony of the experts to the contrary notwithstanding. There was testimony that the foot was more or less deformed since the operation, that the joint was stiff, and that the patient could not wear a shoe for a long time thereafter, and that she had suffered almost constant pain in the injured foot since the operation. From the evidence, the jury might have found that the removal of this sesamoid bone was in a measure responsible for these unfavorable conditions (since the operation). The following excerpt from the decision of the Supreme Court of Alabama, in *Alabama, etc., R. Co. v. Hill*, 93 Ala. 514, 515, 9 South, 722, 724 (30 Am. St. Rep. 65), is pertinent to this question:

"It is to be assumed that every physical endowment, function, and capacity is of importance in the life of every man and woman, and that occasion will arise for the exercise of each and all of them. And to the extent to which any function is destroyed, or its discharge rendered painful or perilous by the wrongful infliction of personal injury, is the party complaining entitled to damages. We can, in other words, conceive of no physical injury, wrongfully inflicted, whether entailing pain only, or disfigurement, or incapacity, relative or absolute, to perform any of the functions of life, which may not be made the predicate for compensation in damages."

Also quoted with approval in 4th Sutherland on Damages, sec. 1241.

The record shows that the foot which had been operated upon was exhibited to the jury at the trial in the court below. The plaintiff in error testified that he only made one incision in the foot. But the evidence produced in rebuttal shows that there were three scars on the foot, as exhibited to the jury; one made by the nail and two made by incisions; one scar on the side of the foot and two on the bottom. And on cross-examination of the defendant in error, it was asked when she first discovered these scars, and she said three days after the operation, and that

she asked Dr. Rolater what he made that cut on the bottom of her foot for, and he replied, "for drainage." This testimony was not denied, and these scars were physical facts which were exhibited to the jury, and they might have raised a question in the minds of the jury as to whether the sesamoid bone was taken from the side of the foot, as testified to by plaintiff in error, or from the bottom of the foot. where the experts testified this bone was usually found. The amount of plaintiff's recovery, if she is entitled to recover at all, must depend upon the character and extent of the injury inflicted upon her, in determining which the nature of the malady to be healed and the beneficial nature of the operation should be taken into consideration, as well as the good faith of the defendant. *Mohr v. Williams, supra.*

The question as to the amount of the recovery, as well as the other disputed questions of fact involved under the issues in the case, were submitted to the jury, under instructions as to the law that have not been questioned. The amount of the verdict was reviewed by the trial court in passing upon the motion for a new trial. The amount of the judgment does not impress us as being in any sense excessive, and we find no good reason for disturbing the judgment appealed from and conclude that the same should be affirmed.

By the Court: It is so ordered.