96 So.2d 716 (1957)
Silas E. CHAMBERS, Appellant,
v.
Walter NOTTEBAUM, Appellee.
No. 57-42.
District Court of Appeal of Florida. Third District.
August 15, 1957.
Rehearing Denied September 13, 1957.
George S. Okell, Sr., Miami, for appellant.
Warren, Klein & Moore, Miami Beach, for appellee.
CARROLL, CHAS., Chief Judge.
Appellant was the defendant in the court below, against whom a jury verdict was *717 rendered. Plaintiff was an adult college student, who was operated on for appendicitis by the defendant surgeon. He sued, alleging trespass to the person, claiming that a resulting permanent injury in the form of a partial paralysis of one of his legs was caused by the use of a spinal anesthetic administered by defendant, allegedly contrary to his express instructions.
The plaintiff's case was not one of malpractice but for trespass to the person, as pointed out in Donald v. Swann, 24 Ala. App. 463, 137 So. 178, 180, certiorari denied 223 Ala. 493, 137 So. 181, which said:
"* * * The distinction lies in the fundamental difference between an action for malpractice and an action for trespass to the person. Trespass to the person is an intentional act which is unlawful, while malpractice arises on account of negligence. Hershey v. Peake, 115 Kan. 562, 223 P. 1113."
See also, Cady v. Fraser, 122 Colo. 252, 222 P.2d 422.
The defendant's answer contained a denial; contended that any restrictions respecting the use of an anesthetic had been released by the plaintiff himself or through his agent; and charged plaintiff with contributory negligence.
Based on his eighteen assignments of error, appellant has stated six questions here. We reduce them to these three: (1) sufficiency of the evidence; (2) failure to include an essential charge to the jury, and (3) a departure in pleading and variance in proof.
In determining the question of liability the jury was required to decide a number of issues on which there was conflicting testimony.
The plaintiff suffered from a lame appendix, for which he consulted the defendant a number of times during the summer of 1951, the year of the operation, while attending a local university summer school. In the middle of August, when he was through school for a period of weeks, it was his testimony that it was suggested by the doctor that he have his appendix taken out at that time for convenience. Plaintiff denied that there was any flare-up or emergency, but the testimony given by the doctor was to the effect that the plaintiff's condition was acute and an emergency situation had arisen.
The plaintiff and his mother testified that when the operation was arranged, on that day in August, the plaintiff informed the doctor that he would not permit a spinal anesthetic, and that the doctor agreed not to use that type of anesthetic. A second conflict was produced in the evidence when the doctor denied that, and testified he did not recall any such discussion.
A third conflict in the evidence related to the circumstances in connection with the plaintiff's mother signing for his admission at the hospital, which included an authority to use any anesthetic determined upon by the doctor. She was not acting for a minor. He had passed his twenty-first birthday. Acting for him as his agent, if the mother signed the authority to use any anesthetic, with his knowledge and consent, or otherwise under circumstances so as to bind him on that feature, it could operate to release any contrary instructions previously given about the spinal anesthetic. On that feature, the plaintiff testified that he was not in the room when she signed the paper in the hospital; that what she signed concerning anesthetics was not within his knowledge; and that his authority to her was limited to having her sign for his admission. His mother's testimony tends to corroborate that.
On the defendant's side there was contrary evidence, to the effect that the plaintiff was in the room; that he saw what his mother was doing; and that reference was made in his presence to the consent for the anesthetics which was included in the document his mother was signing.
The verdict for the plaintiff in this case resolved and settled those conflicts in the *718 evidence, in favor of the plaintiff and against the defendant.
The rule is well established which prevents a doctor from operating on a patient without his express or implied consent, or in a manner contrary to the patient's express instructions. A statement of this rule was made in Wall v. Brim, 5 Cir., 138 F.2d 478, at page 481:
"* * * The law is well settled that an operation cannot be performed without the patient's consent and that one performed without consent, express or implied, is a technical battery or trespass for which the operator is liable. The obligation underlying this rule is not satisfied by a consent obtained under a mistaken diagnosis that the operation is simple and without danger, when a later diagnosis, while the patient is still conscious and no emergency exists, discloses that the operation is both difficult and dangerous. The rule extends no further than to hold that if a physician advises his patient to submit to a particular operation and the patient weighs the dangers and results incident to its performance and finally consents, he thereby in effect enters into a contract authorizing his physician to operate to the extent of the consent given but no further. The same principle which supports the holding that a surgeon performing an operation without his patient's consent, express or implied, commits a battery or trespass for which he is liable in damages, also supports the holding that a surgeon may not perform an operation different in kind from that consented to or one involving risks and results not contemplated."
An emergency arising may furnish an exception. The effect of an emergency situation on the rule is set out in 41 Am.Jur. 222-23, Physicians and Surgeons, § 110, as follows:
"The general rule that a surgeon operates at his peril without first obtaining the consent of his patient or someone legally authorized to consent for him is qualified in its application by most courts in cases of emergency or unanticipated conditions where some immediate action is found necessary for the preservation of the life or health of the patient, and it is impracticable to first obtain consent to the operation or treatment which the surgeon deems to be immediately necessary. According to the rule laid down by some courts, if in the course of an operation to which the patient has consented the physician discovers conditions not anticipated before the operation was commenced, and which, if not removed, will endanger the life or health of the patient, he is, although no express consent is obtained, justified in extending the operation to remove and overcome such conditions. * * * In such a case, where the emergency endangers the life or health of the patient, it is the surgeon's duty to do that which the occasion demands within the usual and customary practice among physicians and surgeons in the same or similar localities, without consent of the patient * * *."
In the case of Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92, at page 93, 52 L.R.A.,N.S., 505, a New York Court of Appeals decision, the opinion prepared by Mr. Justice Cardozo, contains the following:
"In the case at hand, the wrong complained of is not merely negligence. It is trespass. Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages. Pratt v. Davis, 224 Ill. 300, 79 N.E. 562, 7 L.R.A.,N.S., 609, 8 Ann.Cas. 197; Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 1 L.R.A.,N.S., 439, 111 Am.St.Rep. *719 462, 5 Ann.Cas. 303. This is true, except in cases of emergency where the patient is unconscious, and where it is necessary to operate before consent can be obtained. * * *."
An early leading case on this subject was Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 14-15, 1 L.R.A.,N.S., 439, in which the court said:
"* * * It was said in the case of Pratt v. Davis, 37 Chicago Leg.News, 213, referred to and commented on in Cent.Law J. 452: `Under a free government, at least, the free citizen's first and greatest right, which underlies all others  the right to the inviolability of his person; in other words, the right to himself  is the subject of universal acquiescence, and this right necessarily forbids a physician or surgeon, however skillful or eminent, who has been asked to examine, diagnose, advise, and prescribe (which are at least necessary first steps in treatment and care), to violate, without permission, the bodily integrity of his patient by a major or capital operation, placing him under an anaesthetic for that purpose, and operating upon him without his consent or knowledge.' 1 Kinkead on Torts, § 375, states that general rule on this subject as follows: `The patient must be the final arbiter as to whether he will take his chances with the operation, or take his chances of living without it. Such is the natural right of the individual, which the law recognizes as a legal one. Consent, therefore, of an individual, must be either expressly or impliedly given before a surgeon may have the right to operate.' There is logic in the principle thus stated, for, in all other trades, professions, or occupations, contracts are entered into by the mutual agreement of the interested parties, and are required to be performed in accordance with their letter and spirit. No reason occurs to us why the same rule should not apply between physician and patient. If the physician advises his patient to submit to a particular operation, and the patient weighs the dangers and risks incident to its performance, and finally consents, he thereby, in effect, enters into a contract authorizing his physician to operate to the extent of the consent given, but no further. It is not, however, contended by defendant that under ordinary circumstances consent is unnecessary, but that, under the particular circumstances of this case, consent was implied; that it was an emergency case, such as to authorize the operation without express consent or permission. * * * If a person should be injured to the extent of rendering him unconscious, and his injuries were of such a nature as to require prompt surgical attention, a physician called to attend him would be justified in applying such medical or surgical treatment as might reasonably be necessary for the preservation of his life or limb, and consent on the part of the injured person would be implied. And again, if, in the course of an operation to which the patient consented, the physician should discover conditions not anticipated before the operation was commenced, and which, if not removed, would endanger the life or health of the patient, he would, though no express consent was obtained or given, be justified in extending the operation to remove and overcome them. * * *."
Discussion of this rule and its exception also appears in the following authorities: Moos v. United States, 8 Cir., 225 F.2d 705; Donald v. Swann, supra, Ala., 137 So. 178; Wheeler v. Barker, 92 Cal. App.2d 776, 208 P.2d 68; Pratt v. Davis, 224 Ill. 300, 79 N.E. 562, 7 L.R.A.,N.S., 609; Tabor v. Scobee, Ky., 254 S.W.2d 474; Wells v. McGehee, La. App., 39 So.2d 196; Rolater v. Strain, 39 Okla. 572, 137 P. 96, 50 L.R.A., N.S., 880; King v. Carney, 85 Okla. 62, 204 P. 270; Hively v. Higgs, 120 Or. 588, 253 P. 363, 26 A.L.R. 1036; 53 A.L.R. 1056.
*720 In preparation for the operation in this case an anesthetist proceeded to give a general anesthetic, using sodium pentothal injected into the arm. The plaintiff suffered an adverse reaction, and the precarious condition in which it put him is described by the defendant in his testimony.[1] The general anesthetic was discontinued, and the defendant then gave a spinal anesthetic and proceeded to operate on the plaintiff.
Whether there was an emergency requiring the doctor to operate then and there, or whether the operation could be deferred for a period to allow recovery from the effects of the general anesthetic and perhaps allow use of an anesthetic other than a spinal, presented another issue which the jury had to decide.
On that issue, the doctor's testimony was to the effect that he was required to proceed because the man's appendicitis was acute and in his opinion if not operated on the plaintiff would have died in two or three days.[2]
That testimony of the doctor was in conflict with the plaintiff's explanation of his condition earlier that day and at the time the operation was planned.[3]
*721 When the general anesthetic which was given first resulted in a bad reaction on the patient, the actual operation had not been commenced. This was not an instance of an operation in progress or partly completed, which could present an emergency in the form of an obvious need to continue and complete such operation.
By its verdict the jury resolved that conflict, and found against the existence of the need for an immediate operation, so as to excuse the use, without permission, of the spinal anesthetic.
A final point of conflict was presented to the jury in this case by the evidence bearing on the question of whether the use of the spinal anesthetic caused the injury to the plaintiff's leg, which followed the operation. There was credible evidence to support the jury's finding favoring the plaintiff on that point.
From our examination of the record on appeal, we conclude that the jury verdict establishing liability in this case was sufficiently supported by evidence on the material issues which were raised, and that the appellant has not shown the verdict to be against the manifest weight of the evidence.
Appellant's attack on the charge to the jury was argued under Point II in his brief. Appellant stated that question as follows:
"The court in charging that under no circumstances may a doctor deviate from the specific instructions of his patient as to the kind of anesthesia to be given to his patient during a proposed operation erred in failing to qualify such charge where an emergency arises during the course of the operation requiring the use of the forbidden anesthetic in order to save patient's life."
After charging the jury on the duty of a doctor to operate only with permission and within the limits of the express instructions as to type or manner of operation, the court included charges relating to exceptions to the rule where emergency situations arise, as follows:
"The general rule that a surgeon operates at his peril without first obtaining the consent of his patient or someone legally authorized to consent for him, is qualified in its application in Florida in cases of emergency or unanticipated conditions where some immediate action is found necessary for the preservation of the life or health of the patient, and it is impractical to first obtain consent to the operation or treatment which the surgeon deems to be immediately necessary.

*722 "It has been said, too, that the rules of professional conduct of trained and expert surgeons must be fixed to reasonably fit complex modern conditions, and that such a surgeon, confronted by an emergency, must be permitted, after a fair and careful examination of the patient, to exercise his best professional judgment as to the necessity for immediate operation or treatment or anesthetic procedure without waiting for the consent ordinarily required. In such a case, where the emergency endangers the life or health of the patient, it is the surgeon's duty to do that which the case demands, within the usual and customary practice among physicians and surgeons in the same or similar localities, without the consent of the patient or his parents."
The charge just quoted was sufficient on the question of an emergency as an exception to the rule under consideration. Appellant contends that the failure of the judge to include a specific reference to the giving of a forbidden anesthetic under such emergency circumstances, amounted to a prejudicial error. We do not feel that the jury could have been mislead in any such respect. The charge was sufficient to show that liability will not be imposed in the event of an emergency situation as described, even where there was no permission for an operation, and, a fortiori, where the operation was authorized, but the lack of permission or consent related only to an incident thereof, such as the anesthetic.
A single charge is not required to cover all the law relating to the subject treated. In determining the propriety of a challenged charge, the charge that the court has given must be considered as an entirety, and not in isolated portions. Police & Firemen's Ins. Ass'n v. Hines, 134 Fla. 298, 183 So. 831, 833; Adams v. Royal Exchange Assur., Fla., 62 So.2d 591.
The entire charge of the trial court, or the entire portion of it bearing on the particular subject, must be considered in determining whether the challenged charge is free from error. Cases so holding are too numerous to justify citation. Examples are: International Lubricant Corporation v. Grant, 128 Fla. 670, 175 So. 727; Duval Laundry Co. v. Reif, 130 Fla. 276, 177 So. 726; Police & Firemen's Ins. Ass'n v. Hines, supra; Wharton v. Day, 151 Fla. 772, 10 So.2d 417.
On reading the entire charge on the subject we find it to be without error.
There remains for consideration the contention of the appellant that there was a departure in pleading and a variance between allegations and proof.
As a means of defining departure, appellant's brief quoted from Lopez v. Avery, Fla., 66 So.2d 689, 691, as follows:
"* * * the law is that a departure in pleading occurs when a party quits or departs from the case or defense which he has first made and resorts to another which gives rise to a wholly distinct and different legal obligation against his adversary. Crim v. Drake, 86 Fla. 470, 98 So. 349; Livingston v. Malever, 103 Fla. 200, 137 So. 113; Eagle Fire Co. v. Lewallen, 56 Fla. 246, 47 So. 947; Gerstel v. William Curry's Sons Co., 155 Fla. 471, 20 So.2d 802, 804. In determining whether there has been such a substantial departure in after pleading as to authorize the court to dismiss an amended pleading on such ground, `the test is whether the matter introduced by way of amendment requires a different character of evidence for its support than would be required for proof of the antecedent pleading and whether proof of additional facts will be required to sustain the later pleading.' Gerstel v. William Curry's Sons Co., supra."
The amended complaint is claimed by appellant to constitute the departure. In the original complaint both Walter Nottebaum *723 and his mother, Nellie Nottebaum, were plaintiffs. It alleged that the contract for the operation was made between the doctor and the two plaintiffs, and that in the operation the doctor used a spinal anesthetic, when he had contrary express instructions, and such action was there charged as being an assault and battery on the plaintiff, Walter Nottebaum. Compensatory and punitive damages were sought. In the amended complaint the mother was eliminated as a plaintiff. The material allegations upon which recovery was sought in the new complaint were the same, that is, that the operation was made with a spinal anesthetic contrary to express instructions and that injury resulted for which damages were claimed. It was charged in that second complaint that by such action the doctor "did thereby commit a wrong upon and to the person and body of the plaintiff, and did inflict and cause severe, grievous and serious personal injuries to the plaintiff."
Referring back to the appellant's quoted authority as to departure which specified that the test is "whether the matter introduced by way of amendment requires a different character of evidence for its support than would be required for proof of the antecedent pleading, and whether proof of additional facts will be required to sustain the latter pleading," it is readily apparent that the nature of the evidence to make out a case for the plaintiffs, or plaintiff, under each complaint was, if not identical, the same in general, and in substantial respects. Under each, it was necessary to show the arrangement for an operation, the statement of the conditions or permission granted, the operation in a manner violating instructions, and, of course, the consequences. The amended complaint did not require proof of additional facts, but rather the contrary. The amended complaint dropped Mrs. Nottebaum as a party plaintiff, thus lessening the required proofs rather than adding to them. Reference was made to the fact that the first complaint which claimed assault would have involved punitive in addition to compensatory damages, while under the second complaint charging trespass to the person, only compensatory damages were involved. There again, the second complaint served to reduce rather than increase matters requiring evidence or proofs.
Nor are we convinced that a difference of any substance resulted from classifying the injury as an assault, in the first complaint, and as trespass to the person in the amended complaint. Authorities use "assault", and "trespass to the person" interchangeably in this connection. See, Wall v. Brim, supra, 5 Cir., 138 F.2d 478, 481; Donald v. Swann, supra, Ala., 137 So. 178, 180; Schloendorff v. Society of New York Hospital, supra, 211 N.Y. 125, 105 N.E. 92, 93, 52 L.R.A.,N.S., 505; Gelhaus v. Eastern Air Lines, 5 Cir., 194 F.2d 774, 776; and 41 Am.Jur. 220, Physicians and Surgeons, § 108.
Thus, the record fails to disclose a departure or variance as claimed by appellant.
Therefore, the judgment of the lower court should be and hereby is affirmed.
Affirmed.
HORTON and PEARSON, JJ., concur.
NOTES
[1] "Q. Now, what took place after starting giving the general anesthetic of sodium pentothal? A. Soon after the general anesthetic was started, this man went into convulsions, with contractures of all extremities and developed  * * And he developed rules at the base of his lungs, and he did not become cyanotic, but he had a very irregular pulse just previous to the operation, and apparently he was in shock of undetermined cause. Q. Now, let's go back there a minute. You said he developed rales. What is that, in layman's language? I don't believe the jury will understand what those terms mean. A. It means congestion in the lungs. Q. Is there a sound attached to it? A. Yes, sir. Q. What is that sound? A. It is sort of a gargling sound you hear when you examine the chest, and I saw this man had embarrassed respiration, without examining it with a stethoscope. * * * Q. Now, you say he was not cyanotic. What does that mean? A. Cyanotic means blue. He was not cyanotic after we got the convulsions controlled. Q. During the period he was having the convulsions he was cyanotic? A. He was a little bit cyanotic, he turned partially blue."
[2] "A. This man had a previous chronic appendix, and at this time he developed acute appendix. Q. When you say `at this time,' you mean the immediate time of the operation, in particular? A. The day of the operation he developed increased pain and increased or marked tenderness in his abdomen. Q. That was what indicated an acute appendix? A. Yes, sir. * * * Q. Was there any necessity for you to proceed with the operation at that time? A. I think it was of dire necessity, because of his chills and convulsions. Q. What in your opinion may have happened if you had not proceeded with the operation? * * A. I think the man would have went on and died of a ruptured appendix within two to three days. * * * Because I considered the man either had an overwhelming infection that was causing his convulsions, or anaphylactic shock, and I think it would have been hazardous to the man if it hadn't proceeded. Q. Was that your best judgment as a surgeon and physician, that you should proceed with the operation? A. Yes. Q. Why? * * * A. Because of his acute abdomen or overwhelming infection. Q. What did the acute abdomen or overwhelming infection indicate to you? * * A. It indicated that if some positive treatment was not taken, that the patient would die."
[3] "Q. In the morning of August 14, 1951, then, you did have a discussion with the defendant? A. I did. Q. Will you state what was said at that time? A. At that time it was just another routine, going in to see the doctor, and to get my shots, and I was in there getting examined by the doctor and I happened to say in passing that I had just completed my examination for that semester, and I was free now until September, until the fall semester, and he said, `Do you think it would be a good time to have your appendix out now,' and I said, `Well, is there any emergency?' He said, `No; it is up to you if you want it now as far as convenience in case at some future time it starts acting up then you would be in trouble.' So I said, `Well, I didn't think about it, but it probably would be a good time now on account of the layover,' and at that time I told the doctor  I asked the doctor, `Do you give spinals?' He said, `Yes; I have given hundreds of them.' I said, `Doctor, I don't want a spinal. I had a lot of friends tell me that spinals are  you get bad effects from them, and I am against a spinal,' and he said, `Well then, I will make some kind of other arrangements and give you something else.' I said, `That would be find.' My mother was outside in the waiting room and he said, `Call your mother in, and we will talk about having the operation at this time.' So I called my mother in and we discussed the operation, and we all thought it would be a good time, and I told my mother I had just talked to the doctor and told him I didn't want a spinal, and she said, `That is fine; I am against it too.' The doctor said, `Since you are both against it, I will not give a spinal; I will give something else.' That was the discussion then. Q. Where did that conversation take place? A. That was right in his office, commencing about ten o'clock or ten-thirty. Q. What was the occasion for your going to his office at that time? A. Well, I went to visit the doctor on one of these occasions he would say, `Come back in a few days; come back in a week,' whatever was to suit him, to suit his schedule, and I came back at that time. Q. This was just another of a series of appointments? A. That's right. Q. At that time, was your condition any different, as far as you could tell, from what it had been during the past several weeks? A. No, it wasn't. In fact, a night or two before that I went bowling. I had no pain. Sometimes I would have a little pain, but it was nothing worse. It was about the same."