Talmadge N. BUIE, Appellant,

v.

Charles L. REYNOLDS, M.D., and John T. Freie, M.D., Appellees.

No. 48264.

Court of Appeals of Oklahoma, Division No. 2.

May 31, 1977.

Rehearing Denied July 14, 1977.

Certiorari Denied Nov. 16, 1977.

Released for Publication by Order of Court of Appeals Nov. 17, 1977.

Ed Abel, Lampkin, Wolfe, Burger, Abel, McCaffrey & Norman, Oklahoma City, for appellant.

Calvin W. Hendrickson, Oklahoma City, for appellees; Pierce, Couch, Hendrickson & Short, Oklahoma City, of counsel.

BACON, Judge.

This appeal is brought by plaintiff from a jury verdict and judgment thereon in a medical malpractice case. The sole issue for us to decide is whether the trial court erred in refusing to instruct the jury concerning circumstantial evidence.

The record reflects that in May of 1973 plaintiff was a 35-year-old married man with three children. Plaintiff had been experiencing for several weeks what he thought was possibly a kidney infection. His symptoms were a "foul smelling odor to the urine and a burning sensation after sex." Plaintiff consulted with defendant Reynolds who discovered plaintiff's bladder would not empty completely because of an obstruction where the bladder empties into the urethra.

Defendant Reynolds recommended plaintiff have surgery to remove the obstruction. The surgery to be performed was a transurethral resection (TUR). Simply stated the TUR involved introducing an instrument into plaintiff's penis through the urethra to the point where the urethra connects with the bladder and then "chipping" or cutting away the tissue to enlarge the opening from the bladder to the urethra.

On May 22, 1973, the day before the surgery was to be performed on plaintiff, defendant Reynolds visited plaintiff in the latter's hospital room. Defendant at this time introduced defendant Freie as a resident in the hospital who assisted defendant Reynolds. It is undisputed plaintiff was not told defendant Freie would do part of the surgery.

On May 23, 1973, defendants Reynolds and Freie performed the TUR on plaintiff with defendant Freie removing 50 to 70 percent of the tissue that was removed. It

is further undisputed that during the hour-long surgery defendant Reynolds left the operating room on at least two different occasions for coffee, which the defendant surgeons testified was an accepted common practice by most surgeons.

Admittedly defendant Reynolds left the room at least twice but the length of his absences is somewhat unclear. By deposition his absence was said to be a total of 30 minutes but at trial it was stated to be a total of 10 to 15 minutes.

The evidence is undisputed that during one of defendant Reynolds' absences, defendant Freie testified he encountered a hemorrhaging problem, and he sent for defendant Reynolds' assistance. Defendant Reynolds assisted Freie and again left the operating room to return later and complete the surgery.

Three days after the operation a catheter in plaintiff was removed and plaintiff was unable to control the flow of urine from his body. Defendants explained to plaintiff that this problem was not uncommon after a TUR and it should resolve itself by the time plaintiff was released from the hospital. During the remainder of plaintiff's stay in the hospital, plaintiff would "wet" his bed and upon standing would loose the urine in his bladder without being able to control the flow. Plaintiff then used tissue or towels in his underwear to retain his urine leakage any time he got out of bed.

Several days after surgery plaintiff was released to go home with assurances from defendants the problem would resolve itself. Defendants explained to plaintiff that in proceeding through the urethra to the bladder where the cutting was done, it was necessary to pass through what is called the sphincter muscle. The sphincter muscle is just outward from the bladder and circles the urethra. The sphincter muscle is nature's "on and off" muscle and closes on the urethra to seal it, thus controlling the flow of urine from the bladder. Defendants explained to plaintiff that during a TUR and subsequent catherization, the sphincter muscle is sometimes stretched and occasionally it takes up to six weeks before a person totally regains control of his "on and off" muscle.

After several weeks at home plaintiff continued to experience incontinence. Plaintiff employed the use of towels, baby diapers and other paraphernalia in his undershorts to contain his constant leakage.

Thereafter, because of the continuous exposure to urine, plaintiff broke out in a rash, similar to that which young babies experience. Plaintiff then suffered numerous problems in his employment because of his uncontrollable urination which soaked his clothing. He then used a "Cunningham clamp," which is a clamping device used on the male organ to check the leakage. Experiencing problems with the "Cunningham clamp," plaintiff ultimately consulted another doctor on July 30, 1973. This doctor performed a cystoscopic examination upon plaintiff. A cystoscopic examination is simply entering the penis through the urethra to visually inspect the bladder. The cystoscoping doctor reported in his finding that there was a "resection" or cut appearing to go "distal" to the verumontanum. The verumontanum or "vera" is between the sphincter muscle and the bladder and is used as a landmark to work to or from when performing a TUR. If one travels into the body from the verumontanum he is said to go "proximal" and if one travels outward from the verumontanum he is said to be going "distal" to the verumontanum. The tissue to be removed in plaintiff's TUR was undisputedly to be inward or proximal from the verumontanum. The cystoscoping doctor reported that a resection (cut) appeared to go distal to the vera at about 10 o'clock, that is, on the patient's right. There was nothing obstructive. The sphincter was "at least partially intact."

On September 5, 1973 plaintiff consulted his cousin Dr. Buie in Texas who practiced with a Dr. Mallard. Doctors Buie and Mallard were urologists and they also cystoscoped plaintiff. Doctors Buie and Mallard testified they found plaintiff had a "defect" in the sphincter muscle at the same location the other cystoscoping doctor reported a "resection." The two Texas doctors testi-

fied the defect in plaintiff's sphincter muscle appeared to be the same size and shape as that made by a "resectoscope," which is the cutting tool used in performing a TUR.

During this time plaintiff's inability to control his flow of urine presented additional problems. Plaintiff was fired from his job in Oklahoma and moved back to Texas. Plaintiff also began to experience marital problems. The testimony showed that when plaintiff attempted to engage in intercourse with his wife his lack of "control" caused him, for the lack of a better explanation, to urinate in an untimely manner. Plaintiff experienced considerable emotional problems as a result and subsequently was unable to obtain an erection.

Eventually plaintiff was referred to a doctor in Miami, Florida, who had obtained substantial success with patients suffering from incontinence due to a damaged or defective sphincter muscle. The Miami doctor used a procedure of injecting Teflon in liquid form into the damaged area of the sphincter muscle to build up the defect to enable the muscle to form a water tight seal thus holding the urine in the bladder and stopping the leakage.

Plaintiff subsequently visited the Miami doctor and underwent surgery for the Teflon injections on three occasions prior to trial. Normally one or two injections will "dry up" the patient, testified the Miami doctor. Plaintiff, whose incontinence had not subsided at time of trial, testified he was going to go to Miami for his fourth Teflon injection.

The foregoing fairly represents plaintiff's proof. The case was submitted to a jury which returned a verdict for defendants.

Plaintiff now appeals and argues under one proposition of error which reads as follows:

"The trial court erred in refusing to give plaintiff's requested instruction on the effect and force of circumstantial evidence."

In this regard plaintiff argues his "hope for recovery lay in his ability to show that his sphincter muscle was cut as a result of defendants' cutting distal to the vera, close to the sphincter muscle, when defendants admitted that there was no reason to cut distal to the vera."

Plaintiff argues he was at a substantial disadvantage to provide *direct* evidence defendants cut the sphincter muscle because defendants are the only persons possessed of this direct knowledge. Thus, argues plaintiff, he must rely upon circumstantial evidence and therefore he was entitled to an instruction as to the effect and force of circumstantial evidence.

Defendants' position is, because plaintiff had some direct evidence (Doctors Buie's and Mallard's testimony) or because plaintiff's case was not based *solely* on circumstantial evidence, that the trial court did not err in refusing to give the requested instruction on circumstantial evidence.[1] Defendants rely upon *Chase v. Watson*, Okl., 294 P.2d 801 (1956) where the court said in syllabus two:

"When the plaintiff's case does not rest entirely on circumstantial evidence, and although there was some in it, it was not essentially necessary for the court to give special instructions on circumstantial evidence; and with a general charge given

---

1. Plaintiff's requested instruction reads as follows:

"You are instructed that the cause of an injury and, the resulting damages, if any, may be inferred from circumstantial evidence, provided that the inference is reasonable, though not absolute or a necessary one. Such evidence is not required to dispel all doubt and uncertainty; neither is it required to eliminate the possibility that the injury was brought about by some other cause. It need only appear more probable by a preponderance of the evidence that the occurrence was caused in

whole or in part by the defendant than by some other cause. In this connection, you are instructed that evidence may be either circumstantial or direct, and that circumstantial evidence, as distinguished from direct evidence, is testimony not based on actual personal knowledge or observation of the facts in controversy but of other facts from which deductions are drawn showing indirectly the facts that ought to be proved. The manner of the occurrence or happening of an event in a civil case may be proved or disproved by circumstantial evidence."

to the jury to reach its conclusions from all the facts and circumstances appearing in evidence, there is no cause for the plaintiff to complain of a failure of the court to give special instructions on circumstantial evidence."

As we view this case, we think the parties are talking about two different things in their briefs. We think there are three vital issues involved in this lawsuit, to wit: (a) was plaintiff's sphincter muscle damaged; (b) if so, did defendants damage the sphincter muscle; and (c) if defendants caused the damage, were they negligent in so doing.

Certainly before plaintiff is entitled to recover in the present case he is going to have to prove the above three elements by a preponderance of the evidence. This of course can be by direct or circumstantial evidence.

It seems to us that to interpret *Chase v. Watson*, supra, as strictly as defendants do in the present case would be to place upon the case an interpretation not intended by the court. Under defendants' interpretation of *Chase*, it would never be error for a trial court to refuse an instruction on circumstantial evidence if there was *any* direct evidence in the case. We think in *Chase* the court did not intend such a result, particularly where the most vital parts of a case or a defense are provable only by circumstantial evidence. We think in *Chase* the court simply was holding that where a party is not relying entirely upon circumstantial evidence but instead relies primarily upon direct evidence, it is not error for the trial court to decline to instruct specifically upon circumstantial evidence where the instructions, given in substance, cover the requested instruction. Further, the opinion in *Chase* does not apprise the reader of the contents of all the instructions given and requested.

Defendants use *Chase* to bolster their argument that plaintiff was not entitled to an instruction on circumstantial evidence by contending that because plaintiff had direct testimony through Doctors Buie and Mallard to the effect the sphincter muscle was damaged, this would preclude plaintiff from obtaining an instruction that plaintiff could prove circumstantially defendants damaged the muscle and were negligent in so doing. However, inasmuch as plaintiff could *prove only circumstantially* defendants damaged the muscle and were negligent in so doing, we think the trial court erred in refusing to so instruct.

■ Defendants reason in the present case, because the trial court stated as in *Chase* that the jury was instructed to reach its conclusions "from all the facts and circumstances appearing in evidence," this would suffice in lieu of a specific instruction on circumstantial evidence. We disagree with defendants' reasoning. This instruction simply tells the jury the party must prove his case by a preponderance of the evidence and the jury is to consider all the facts and circumstances of the case. This *does not* tell the jury the preponderance of the evidence could be established by circumstantial evidence and the reasonable inferences deducible therefrom. *Pacific Ins. Co. v. Frank*, Okl., 452 P.2d 794 (1969). In *Pacific Insurance*, the court, through Justice Berry, more accurately addressed the problem than did the court in *Chase v. Watson*, supra. In *Pacific Insurance*, the court reversed the trial court for not giving an instruction relating to circumstantial evidence where the defendant insurance company was trying to prove arson was committed by the plaintiff. There the court said:

"In *Chase v. Watson*, Okl., 294 P.2d 801, error was urged for refusal of three requested instructions which contained reference to circumstantial evidence plaintiffs assertedly relied upon to show fraud and misrepresentation. Denying this contention, we pointed out the instructions given included the substance of those requested. And, since plaintiffs' case did not rest entirely upon circumstantial evidence, it was unnecessary for the trial court to give special instructions in this regard.

"The two decisions last cited are persuasive of two principles. First, where a requested instruction expounds a pertinent legal principle not fully covered by the instructions given, the trial court should embody this in a proper instruc-

tion for the jury's consideration. Second, under *Chase*, supra, it would appear where a litigant relies entirely upon circumstantial evidence in support of the cause of action or defense, the trial court must give a special instruction in this regard.

"The defense of arson was provable by circumstantial evidence. Indeed, it is highly unlikely such defense could be supported otherwise in most cases. The circumstantial evidence offered by defendant, if properly submitted for consideration and believed by the jury, would have been sufficient to sustain the defense presented. The trial court's instruction (No. 4) merely stated arson was a defense if the jury found plaintiff burned, or procured burning of the store; but if arson was involved and defendant failed to prove plaintiff committed or procured commission of arson by preponderance of evidence they should find for plaintiff on this question. The jury neither was advised, nor had means of knowing, this defense was provable by circumstantial evidence which properly should be considered, or that a preponderance of evidence could be established by circumstantial evidence and the reasonable inferences deducible therefrom.

"It is the trial court's duty to instruct the jury properly upon issues formed by the pleadings and evidence. Defendant's pleadings and supporting evidence presented the theory of defense. This matter further was called to the court's attention by a tendered instruction which was refused. Failure to instruct the jury, both as to the theory of defense and the permissible means of proving same, was sufficiently prejudicial to defendant's case as to have prevented a full and fair consideration of the issue."

Applying the foregoing to the present case, it seems clear plaintiff had to prove by a preponderance of the evidence defendants damaged the muscle and that it was negligence for them to do so. As the court stated in *Pacific Insurance*, supra, the jury was neither advised nor had means of knowing that this was provable by circumstantial evidence or that a preponderance of evidence could be established by circumstantial evidence and the reasonable inferences deducible therefrom.

We find under these circumstances that the trial court's refusal to instruct on the effect and force of circumstantial evidence was sufficiently prejudicial to plaintiff's case as to have prevented a full and fair trial of the issues of this case. The case is reversed and remanded to the trial court with directions to grant a new trial.

NEPTUNE, J., concurs.

BRIGHTMIRE, Presiding Judge (specially concurring).

I would like to add a couple of observations to those set out in the majority opinion.

First, the admitted fact is that plaintiff hired Dr. C. L. Reynolds to perform the transurethral operation on his prostate. He did not hire a resident trainee, nor authorize or consent to one doing the finically exacting procedure. Admittedly, though, a resident did perform the operation thereby engaging in a type of ghost surgery which is condemned by the law as malpractice and by the American Medical Association as "a fraud and deceit and a violation of a basic ethical concept."[1] A surgeon may not, says the A.M.A. article, permit "surgery residents, in training, to perform operations on private patients under the supervision of the patient's surgeon . . . without the knowledge or consent of the patient." In light of this it would seem the sole material issue in the case was and is whether defendants damaged plaintiff's urethra sphincter—an issue which can only be proved circumstantially.

Parenthetically, I should mention that in an effort to justify the unlawful delegation of defendant Reynolds' surgical duties to a trainee in this case, defendants rely heavily on what they call "accepted" or "customary" practice in Oklahoma City. This excuse, however, is without legal substance primarily because such accepted or custom-

1. 209 J.Am.Med.Ass'n 947 (Aug. 11, 1969).

ary practice of physicians is illegal. To the extent accepted or customary practice is contrary to existing law it affords no protection against liability.

In this country an individual has a "natural right"—which the law recognizes as a legal right—to determine whether to submit to elective surgery or not, and if he does submit, to choose the surgeon who shall perform it. If a patient consents to a particular operation by a particular surgeon, he has, in effect, entered "into a contract authorizing his physician to operate to the extent of the consent given, but no further." One who operates without consent of the patient commits a wrongful act and is liable therefor in damages. *Rolater v. Strain*, 39 Okl. 572, 137 P. 96 (1913). The wrongful act renders the one who performs the surgery without consent guilty of a battery and the physician who receives a fee for doing surgery he did not in fact do guilty of obtaining money under false pretenses—a species of fraud and deceit—and breach of contract.

The second point I wish to make is that the foundation facts in the case not only require reliance on the rule of circumstantial evidence but in my opinion they invoke application of a famous facet of the rule—res ipsa loquitur—which creates a presumption of negligence.[2] The evidence, in condensed form, is that plaintiff experienced no urinary incontinence before surgery. He did so afterwards. The cause of the leakage was shown by experts to be damage to the sphincter muscle through which the resident defendant gained entrance to the bladder with a Timberlake resectoscope sheath and obturator and a Stern-McCarthy resectoscope, and that the vital muscle had been "resectioned," that is, a portion had been cut out.

Thus the jury could find—indeed the record discloses no other plausible cause—that the malfunctioning sphincter muscle resulted from a cut during surgery by an instrument under the exclusive control of the trainee and, with regard to the theory of negligence, that in the absence of unskillfulness or carelessness such injury does not ordinarily occur during a TUR procedure. The other element, damage, is well established.

Res ipsa loquitur being a procedural rule of justice need not be pleaded and plaintiff is entitled to its use if the evidence establishes the foundation facts. *Creswell v. Temple Milling Co.*, Okl., 499 P.2d 421 (1972).

---

**2.** See *St. John's Hospital & School of Nursing, Inc. v. Chapman*, Okl., 434 P.2d 160 (1967); and 76 O.S.1976 Supp. § 21 which reads:

"Presumption of negligence—In any action arising from negligence in the rendering of medical care, a presumption of negligence shall arise if the following foundation facts are first established:

1. The plaintiff sustained any injury;

2. Said injury was proximately caused by an instrumentality solely within the control of the defendant or defendants; and

3. Such injury does not ordinarily occur under the circumstances absent negligence on the part of the defendant.

"If any such fact, in the discretion of the court, requires a degree of knowledge or skill not possessed by the average person, then in that event such fact must be established by expert testimony."