## WALL v. BRIM.
### No. 10740.

Circuit Court of Appeals, Fifth Circuit.
Oct. 20, 1943.

Grover Middlebrooks, of Atlanta, Ga., and Clifford E. Hay, of Thomasville, Ga., for appellant.

A. B. Conger, of Bainbridge, Ga., and Ira Carlisle, of Cairo, Ga., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was for malpractice. The claim was that in making the diagnosis with respect to, and in performing an operation for, the removal of a growth or cyst located in plaintiff's neck just under and back of her ear, defendant did not bring to the exercise of his profession the reasonable degree of care and skill required by law.[1] This was denied, and there was a trial to a jury.

Plaintiff offered no expert medical testimony. Instead she relied entirely on the testimony of herself and her husband as to the circumstances attending the making of the diagnosis,[2] particularly as to what

---

[1] "A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." Sec. 84-924 Code of Georgia, 1933. Bryan v. Grace, 63 Ga.App. 373, 11 S.E.2d 241; Slack v. Crawford, 5 Cir., 131 F. 2d 101; Pilgrim v. Landham, 63 Ga.

App. 451, 11 S.E.2d 420; Georgia Northern Ry. Co. v. Ingram, 114 Ga. 639, 40 S.E. 708; Akridge v. Noble, 114 Ga. 949, 41 S.E. 78.

[2] These were that the defendant felt of the cyst, told her it was just a small cyst which could be taken out in ten minutes without difficulty or any attendant seriousness, that he could take it out in the office, but he preferred them to go to a hospital and that within thirty min-

the defendant told and did not tell them, and the performance of the operation, including what the defendant found out after the operation was commenced, and what he said during and after it.[3] Defendant testified, in affect and two other physicians corroborated him, that he possessed, and in the diagnosis and performance of the operation as a whole had exercised, a reasonable degree of care and skill. There was a verdict and judgment for the plaintiff, and defendant is here insisting that there was error (1) in denying his motion for a directed verdict, (2) in overruling his motion to set the verdict aside and enter judgment for defendant notwithstanding.

Pointing to the complete absence of medical expert testimony on behalf of plaintiff and the consensus of it on his behalf, defendant invokes the rule which prevails in Georgia[4] and generally elsewhere[5] that "Opinion evidence to be admissible in a malpractice case on the issue of whether or not a physician or surgeon exercised the requisite skill and care in the treatment of his patient must be founded on expert knowledge, that is, better than that possessed by members of the jury".

Plaintiff on her part insists that the disastrous, indeed shocking, results[6] of the operation in contrast with the doctor's original diagnosis,[7] on which alone her consent to the operation was based; her testimony

---

utes after she went to the hospital she would be out.

[3] She testified that while the operation was in progress the defendant said, "Uh, uh, I have done the wrong thing.", and that at that time she felt like something terrible had happened, that everything had just fallen out, her whole nerves. During the operation the defendant told her that he had found a condition different from what he thought when he commenced the operation. "Yes, sir, he said it was a little deeper than he thought. But he did not ask my opinion as to whether or not I wanted to go on with the operation." She further testified that if she had had any idea of the result that might have happened, she would not have undergone the operation. Her husband testified that the doctor told him he was in a hurry to get to a golf game, that he was already late for it. The defendant testified that after he had made a small incision and before he had commenced to operate, he found out how deeply it was embedded, and, to use his expression, "I found out I had gotten into a mess". He also testified as follows: "Q. Now let me ask you this, when you discovered that your original diagnosis was in error, did you acquaint her with that fact? A. Yes, sir, I told her and her husband that the thing was bigger than I thought it was." "Q. Her husband was in the operating room? A. No, I talked to him five minutes afterwards." "Q. I am talking about after you discovered it, did you suggest to her, 'This is larger than I thought it was.'? A. I told the patient that the thing was deeper than we thought it was." "Q. Did you ask her then whether or not she wanted to go forward with the operation after you made this discovery? A. I don't recall that I did, but usually a patient will

let you go ahead and do what you think is best anyway. After all, that is what you are there for." "Q. But you did not ask her about that? A. No." "Q. In other words, when you discovered that your original diagnosis was wrong, you proceeded then on your own judgment and without suggesting to her that situation? A. I guess you would say that is the effect of it. I think so."

[4] Pilgrim v. Landham, 63 Ga.App. 451, 11 S.E.2d 420, and cases cited in Note 1, supra.

[5] 41 Am.Jur. § 129; Calhoun v. Fraser, 23 Tenn.App. 54, 126 S.W.2d 381.

[6] Plaintiff testified, and there was no substantial contradiction, that as a result of the operation, "My mouth is drawn to one side, my tongue is partially paralyzed, I can't chew on this side at all. I have no sense of touch on this side of my face. I have to take my finger and move the food, my tongue won't move it. At times I can hardly swallow. My tear ducts in my eye fill up, and my eye weeps and won't close. I haven't been able since the operation to close my eye."

[7] Plaintiff testified that he said: "Oh, that's nothing. It is not a serious operation at all. It's a small cyst just under the skin", that all he had to do would be to make an incision and peal it out just like you would peal a pea out of a pod; that he could take it out in ten minutes. Defendant himself testified that when he first examined the cyst, he thought it was a very small one and that he could get it out in ten minutes. "Q. Did you tell her it would be a very simple operation? A. I did." "Q. You told her that you could take it out in five or ten minutes? A. I thought I could." "Q. And you told her you could simply pull it out like hulling a pea out of a pod? A. Yes "

that while the operation was in progress, the defendant said, "Uh, uh, I have done the wrong thing", and that at that time she felt like everything had just fallen out, her whole nerves; her husband's testimony that the doctor told him he was in a hurry to get to a golf game; the doctor's own testimony that after he had made the small incision and before he had commenced to operate, he found out how deeply it was embedded and did not then advise her of the possible danger of the operation [8] and secure her consent to perform it under the new and correct diagnosis, raised an issue of fact as to whether looking at the diagnosis and operation as a whole he had in respect of them exercised a reasonable degree of care and skill and otherwise conducted himself as required of a physician and surgeon.

It is settled law in Georgia, as well as generally elsewhere, that a physician or surgeon does not guarantee the results of a treatment or operation, and that proof alone that an operation is different in its outturn from that expected, or is followed by disastrous instead of beneficial results, neither establishes, nor supports an inference of want of proper care, skill or diligence.[9] In view, therefore, of the absence of expert opinion evidence that defendant did not, and the presence of such evidence that he did possess and exercise reasonable care and skill both, in making the correct diagnosis before he actually physically performed, and in physically per-

[8] As to the actual operation, defendant testified, "During the operation we found that this cyst instead of being a small cyst about the size of the end of your thumb had actually extended down between some muscles, which is very unusual. We were trying to make a small incision without making any more scar than necessary, and we cut down on the thing with knife through the skin". We got along fairly well. It took more time than I thought it would. I thought when I examined it that I could take it out in ten minutes and that is what I told her in the office. I had taken out hundreds of them, and I never had had one that went down like this one did; and when I saw how it was, I could have stuck a ho'e in it and let the water out and stopped then, but it would have come right back, wouldn't have been any trouble at all. I could have backed right out and wouldn't have had anything, but men doing surgery have to do the best they can when they get into a mess. This was a mess. It was deep-seated, a thin wall cyst, and I was doing my best to get it out with as little trouble as I could." "Q. Doctor, when you encounter, when a physician encounters or meets a cyst the size and shape of this particular cyst, located in the same place where you found this cyst, state whether or not it is in close proximity to the facial nerve. A. Yes, sir, it is in close proximity to the facial nerve." "Q. State whether or not physicians generally, using the care and skill which physicians generally use in removing a cyst of that kind, can in all cases fail to stretch the facial nerve? A. In separating the cyst from the structure around it, you have got to move something, either the cyst on the one hand or the nerves, blood vessels or muscles on the other. You have got to ream it out. You can't wash it out." Defendant's witness, Dr. Fike, testified, "Well, if the cyst lies in close relationship, if it is situated near where the facial nerve comes out of the skull and crosses over to the face, it is perfectly impossible to remove anything there without stretching or moving not only the facial nerve but several other nerves and bloodvessels.", and on cross examination: "Q. Now doctor, suppose that a surgeon diagnoses a patient as having a small cyst on the neck which can be removed in five or ten minutes by a simple incision and hulling out like it was a pea, and that the surgeon and the patient go in the operation with that belief, and the surgeon later discovers that he has misdiagnosed that case and finds a deep-seated cyst, wouldn't it be the duty of the physician to inform the patient of that matter." "Q. Wouldn't good practice, doctor, require that the patient be so advised before you would proceed with the operation? A. I don't know. I think that would largely depend on the patient and on the doctor, on the individual and on the general set up. Personally, my feeling is that a patient not only ought to be advised of what you think but of what is liable to turn up." And the undisputed testimony that the operation was done under local anesthetic, and the patient was fully conscious and at herself at all times.

[9] Branch v. Anderson, 47 Ga.App. 858, 171 S.E. 771; White v. Executive Committee, 65 Ga.App. 840, 16 S.E.2d 605; McTyeire v. McGaughy, 222 Ala. 100, 130 So. 784; 41 Am.Jur. Sec. 126; Ewing v. Goode, 78 F. 442; Schoening v. Smith, 59 N.D. 592, 231 N.W. 278; Bryan v. Grace, supra; Brewer v. Ring, 177 N.C. 476, 99 S.E. 358.

forming, the operation, we should, if the record presented no other issue as to defendant's breach of his obligation as a physician, feel compelled to order a reversal with directions to enter judgment for defendant notwithstanding the verdict. For neither the statement "Uh, uh, I have done the wrong thing", nor the statement that he was in a hurry and late to a golf game, attributed to defendant, and on which plaintiff asked for a verdict, was sufficient to supply the critical absence of expert opinion evidence. But though not specifically presented by the pleadings and apparently not submitted to the jury, the record, in the light of Rule 15(b) [10] authorizing the amendment of pleadings to conform to the evidence definitely presented another issue which should have been developed before, and submitted to, the jury. This was whether the defendant did not breach the obligation which as a surgeon he owed plaintiff when, after making the incision and ascertaining that the operation would be not the absolutely simple one he had secured plaintiff's consent to perform, but a serious and difficult one fraught with possible, if not probable dangers, he went ahead without making full disclosure of the difficulties attending, and the possible dangers of, the operation and securing her consent to go forward under the new found conditions. The law is well settled that an operation cannot be performed without the patient's consent and that one performed without consent, express or implied, is a technical battery or trespass [11] for which the operator is liable. The obligation underlying this rule is not satisfied by a consent obtained under a mistaken diagnosis that the operation is simple and without danger, when a later diagnosis, while the patient is still conscious and no emergency exists, discloses that the operation is both difficult and dangerous. The rule extends no further than to hold that if a physician advises his patient to submit to a particular operation and the patient weighs the dangers and results incident to its performance and finally consents, he thereby in effect enters into a contract authorizing his physician to operate to the extent of the consent given but no further.[12] The same principle which supports the holding that a surgeon performing an operation without his patient's consent, express or implied, commits a battery or trespass for which he is liable in damages, also supports the holding that a surgeon may not perform an operation different in kind from that consented to or one involving risks and results not contemplated.[13]

In the light of these principles, and of the undisputed evidence in the case, it cannot be said that a verdict for defendant is demanded or that, reversing the cause, we should direct a judgment notwithstanding the verdict. Neither can it be said that the judgment should be affirmed. For the issue, as to whether the defendant in proceeding with the operation as he did after discovering its true character, without advising plaintiff of its nature and securing her consent to it, committed a trespass upon her or a breach of his obligation to exercise the care and skill required of him, was not developed and tried out as it should have been. The judgment must, therefore, be reversed, and the cause remanded for trial anew with full right to the parties to amend their pleadings and to offer new and additional evidence as they are advised.

Reversed and remanded.

---

[10] Federal Rules of Civil Procedure, 28 U.S.C.A. following sec. 723c.

[11] 41 Am.Jur. §§ 108–109; 48 C.J. § 120.

[12] Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 1 L.R.A.,N.S., 439, 442, 111 Am.St.Rep. 462, 5 Ann.Cas. 303.

[13] Bennan v. Parsonnet, 83 N.J.L. 20, 83 A. 948; 41 Am.Jur. § 109. Authorizing a minor operation ordinarily does not justify performing a major operation which involves risks or results of a kind not contemplated. Pratt v. Davis, 224 Ill. 300, 79 N.E. 562, 7 L.R.A.,N.S., 609, 8 Ann.Cas. 197; State v. Housekeeper, 70 Md. 162, 16 A. 382, 2 L.R.A. 587, 14 Am.St.Rep. 340.