**John N. DUNHAM, Administrator of the Estate of Dorothy Louise Sipling, deceased, Appellant,**

v.

**Frederick W. WRIGHT and Frederick M. Wright.**

**No. 18077.**

United States Court of Appeals, Third Circuit.

Argued Jan. 20, 1970.

Decided March 19, 1970.

Lewis H. Markowitz, Markowitz, Kagen & Griffith, York, Pa., for appellant.

John C. Dowling, Huette F. Dowling, Dowling & Dowling, Harrisburg, Pa., for appellees, (Dowling & Dowling, Harrisburg, Pa., on the brief).

Before FORMAN, SEITZ and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

 Legal-medico jurisprudence requires that a physician obtain the consent of a patient before performing surgery unless the need for such consent is obviated by an emergency which places the patient in immediate danger and makes it impractical to secure such consent.[1] This blackletter rule, clear

---

1. *See e. g.*, Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966); Moos v. United States, 225 F.2d 705 (8th Cir. 1955); Wall v. Brim, 138 F.2d 478, 481 (5th Cir. 1943); Bonner v. Moran, 75 U.S.App.D.C. 156, 126 F.2d 121, 122 (1941); Mohr v. Williams, 95 Minn. 261, 104 N.W. 12 (1905); McCoid, A Reappraisal of Liability for Unauthorized Medical Treatment, 41 Minn.L.Rev. 381 (1957); Anno. "Consent as a Condition of Right to Perform Surgical Operation."

and simple on its face, has occasioned courts in many jurisdictions to grapple with defining the elusive concepts of "consent" and "emergency." These concepts require courts to develop a delicate balance between the right of the patient to choose the treatment he wishes to undergo and the freedom of the physician to practice responsible and progressive medicine without fear of frequent litigation.

In this suit, brought after the unfortunate death of Mrs. Dorothy Louise Sipling following surgery, we are called upon to explore the necessary elements of these concepts which have evolved from attempts to understand the proper relationship between physician and patient and to protect the right of the patient to decide whether "he will take his chances with [an] operation, or take his chances of living without it." [2]

The action here, instituted by decedent's administrator pursuant to diversity jurisdiction, seeks to hold defendant physicians, Dr. Frederick W. Wright and his son, Dr. Frederick M. Wright, responsible for Mrs. Sipling's death which occurred after a thyroidectomy operation performed by the elder Wright. Plaintiff alleged at trial that the operation was performed negligently, and without a valid consent by the decedent or her husband. Although defendants obtained two signed form consents, plaintiff contended that these forms were ineffective because the defendants failed to alert Mrs. Sipling or her husband to the dangers inherent in the operation and failed to advise them of the alternative methods of treating Mrs. Sipling's condition.

The case was tried by the Honorable William J. Nealon and a jury. After five days of testimony the jury was requested to determine whether defendants were negligent in preparing the decedent for the operation, whether defendants obtained consent to the operation, or whether an emergency existed thus eliminating the need for consent. The jury returned a verdict for the defendants.

Plaintiff filed motions for judgment n. o. v. or in the alternative for a new trial. They were denied. In those motions, and on this appeal, plaintiff asserts that there was as a matter of law insufficient evidence to permit the jury to conclude that defendants obtained an "informed" consent, or that an emergency existed so as to permit defendants to operate without such consent. Plaintiff also contends that the charge to the jury was incorrect on the issues of consent and emergency. Since plaintiff is appealing primarily from the dismissal of a motion for judgment n. o. v., we are required to consider the facts surrounding Mrs. Sipling's operation in the light most favorable to the defendants.

Mrs. Sipling, who was suffering from an "extremely toxic goiter", was referred to the defendants by her family physician in order "to have thyroid surgery performed." The first consultation with Dr. F. W. Wright was on December 12, 1963. In his opinion, "she was one of the most extremely seriously ill women due to her goiter that [he had] ever seen". Indeed, he "felt that she was an emergency", and had her admitted immediately to the Hanover Hospital. Dr. F. W. Wright stated that the first time he saw her, he told her and Mr. Sipling that the only possible way she could recover was to have surgery performed, and that thyroid surgery was "serious". Mr. Sipling conceded that the first time he and Mrs. Sipling met with Dr. F. W. Wright, the doctor advised there would be an operation.

76 A.L.R. 562, 139 A.L.R. 1370. As Judge Cardozo stated in Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92, 93 (1914): "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages".

2. Mohr v. Williams, 95 Minn. 261, 104 N. W. 12, 15 (1905).

When Mrs. Sipling was admitted to the hospital, both she and her husband signed an authorization for medical and surgical treatment. In the hospital she was given drugs to get her thyroid gland in an "euthyroid" [3] state before the operation. Although seriously ill, she was permitted to go home for the Christmas holidays. The defendants saw her in their office on January 16, 1964. Her condition had deteriorated, and she was again admitted as an emergency patient. At the time of the second admission, another authorization was signed by Mrs. Sipling.

Mr. Sipling testified that whenever he asked Dr. F. W. Wright when he was going to operate, Dr. Wright told him that Mrs. Sipling would be operated on "as soon as her pulse was down and her nerves calmed down." Dr. F. W. Wright testified that he "talked to Mr. Sipling frequently and told him that [he] would operate on [his wife] as soon as [he] felt that she was in good enough condition to be operated on." He said he "couldn't tell the exact day, but [he] told him at one stage that it would be done on either of the following two days."

Dr. F. W. Wright testified that on February 6, 1964, the point was reached where the drugs had begun to lose their effectiveness, and if she were not operated on at that particular time she might never have been able to have an operation. Dr. F. W. Wright performed the operation that day. Mrs. Sipling died on February 7th at 1:30 a.m.

■ Since jurisdiction here is predicated on diversity and inasmuch as the decedent and her husband are citizens of Pennsylvania and the operation was performed in that state, it is clear that Pennsylvania law is controlling.

■■ The parties do not contest the general principle that in the absence of an emergency the patient's consent is a prerequisite to a surgical operation.[4] They do differ, however, in their interpretation of the more recently promulgated rule in Pennsylvania that a consent is operative only if it is an "informed" or "knowledgeable" consent. Gray v. Grunnagle, 423 Pa. 144, 155, 223 A.2d 663 (1966).[5]

In Gray v. Grunnagle, the Pennsylvania Supreme Court adopted the approach of jurisdictions that have tried to give substance to a patient's right to decide for himself what surgical procedures he wishes to undergo. These jurisdictions consider an effective consent one which is made after the patient has been advised of the possible consequences and

---

3. Dr. Carl E. Ervin testified that "euthyroid" is a medical term to describe a state in which the patient's thyroid is brought as close as possible to a normal situation.

4. In Pennsylvania, a surgeon who performs an unauthorized operation is charged with assault. Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966); Smith v. Yohe, 412 Pa. 94, 194 A.2d 167 (1963); Dicenzo v. Berg, 340 Pa. 305, 307, 16 A.2d 15, 16 (1940); Moscicki v. Shor, 107 Pa.Super. 192, 195, 163 A. 341, 342 (1932). Here the plaintiffs framed their complaint in terms of negligence and the judge so charged the jury. Some jurisdictions consider an action against a physician who operates without an informed consent as one sounding in negligence. See e. g., Wilson v. Scott, 412 S.W.2d 299 (Texas 1967); Di Fillipo v. Preston, 53 Del. 539, 173 A.2d 333 (1961); Natanson v. Kline,

186 Kan. 393, 350 P.2d 1093, rehearing denied, 187 Kan. 186, 354 P.2d 670 (1960); cases cited at 21 Southwest L. Rev. 843, 845 n. 22 (1967). In a case note on Di Fillipo v. Preston in 76 Harv. L.Rev. 1445, this position was considered "Justifiable, though not inevitable," since the element of intent is obscure where the physician operates believing he has an effective consent, but it is later determined such consent was not "informed." The treatment of such action as sounding in negligence is approved in an extensive law review article by Marcus L. Plante, infra note 6, discussing the major cases in the field.

5. Gray v. Grunnagle is discussed in Informed Consent to Surgery—Substitution of Patient's Subjective Understanding of Notice and Risks of Procedure for Objective Reasonable Man Test, 41 Dick.L.Rev. 675 (1967).

risks inherent in the particular operation, and therefore impose upon a physician the duty to disclose to his patient the possible adverse results of an operation.[6]

■ Although it is not clearly articulated, a careful analysis of the rationale of the applicable citations, including Gray v. Grunnagle, indicates that before a patient will be deemed to give an informed consent, it may be necessary that he know the alternative methods of treatment available to him and the inherent dangers and possibilities of success of such alternatives. The philosophy behind such theory of informed consent is that the patient has the right and responsibility to determine whether he wants to risk the suggested corrective surgery. If a patient's decision is to be a knowing and intelligent one, he must understand in addition to the risks of the suggested surgery, the possible results of the failure to chance it. A complete understanding of the consequences of foregoing the operation would seem necessarily to include a consideration of the alternative treatment for the patient's disease or condition.[7]

■ Some jurisdictions considering the duty of a physician to disclose to a patient the hazards of surgery have given the physician broad discretion by saying that a physician does not have to alarm a patient by explaining all such possibilities.[8] *Grunnagle*, however, makes it clear that in Pennsylvania a consent is "informed" only if the patient knows what is apt to happen to him and the possible adverse results and dangers of the operation. The logical inference from this formulation may be that it is not the prerogative of the physician to

6. *E. g.*, Wilson v. Scott, 412 S.W.2d 299 (Texas, 1967); Woods v. Brumlop, 71 N.M. 221, 377 P.2d 520 (1962); Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, rehearing denied, 187 Kan. 186, 354 P.2d 670 (1960); Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal.App.2d 560, 317 P.2d 170 (1957); Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W.2d 186 (1958). *See also*, Anno. "Malpractice: Physician's Duty to Inform Patient of Nature and Hazards of Disease or Treatment," 70 A.L.R.2d 1028 (1961). For a discussion of informed consent, see the following law review material: Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.L.Rev. 628 (1969); Campbell, Civil Liability For Investigational Drugs: Part I, 42 Temple L.Q. 99, 139–143 Part II, 42 Temple L.Q. 289, 297–307 (1969); Plante, An Analysis of "Informed Consent," 36 Ford.L.Rev. 639 (1968); Comment, Informed Consent in Medical Malpractice, 55 Cal.L.Rev. 1396 (1967); Comment, 79 Harv.L.Rev. 1445 (1961); Powell, Consent to Operative Procedures, 21 Md.L.Rev. 189 (1961). Although the concept of an "informed" consent is a development of the last decade, it was foreshadowed in older cases which conceived of the relationship of a physician-patient as contractual. Such cases considered that the contract authorizing surgical procedure did not authorize operations "involving risks and results not contemplated." Wall v. Brim, 138 F.2d at 481 (5th Cir. 1943).

7. Russell v. Harwick, 166 So.2d 904 (Fla.App.1964) cert. discharged, 182 So. 2d 241 (Fla.1966) and Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W.2d 186 (1958) hint at a recognition of the duty of a physician to disclose to the patient the alternatives to surgery. These cases were cited by the Pennsylvania Supreme Court in Gray v. Grunnagle as indicating the relevance of explaining alternative treatment to a patient before obtaining consent.

8. *E. g.*, Watson v. Clutts, 262 N.C. 153, 136 S.E.2d 617, 621 (1964); Roberts v. Wood, 206 F.Supp. 579, 583 (S.D.Ala. 1962). These cases are concerned with disclosures to patients where such would be harmful to the patients' emotional state. Suggestions to avoid this problem have been made in law review comments. A patient could delegate his choice to the physician if he does not want to know the details of surgery. 55 Cal.L.Rev. at 1409. Disclosure could be made to a relative. 76 Harv.L.Rev. at 1448. These exceptional cases should not negate the physician's duty to disclose information to the great majority of patients. A patient should not be prevented from making a choice to decline treatment even if others consider the choice wrong. 76 Harv.L.Rev. at 1448, 55 Cal.L.Rev. at 1410.

keep secret and screen out any of the possible complications of surgery.[9]

Gray v. Grunnagle was an action in trespass by a plaintiff alleging he suffered disability and damages as a result of surgery performed by the defendant physician without consent and in a negligent manner. The judge withdrew the issue of negligence and submitted the case to the jury solely on the question of informed consent. The jury returned a verdict of $80,000.

The court *en banc*, however, granted the defendant's motion for judgment n. o. v. On appeal the Pennsylvania Supreme Court reversed saying "whether or not plaintiff had consented to the operation or substantially the operation" was an issue for the jury. 423 Pa. at 166, 223 A.2d at 674. In a lengthy opinion, the Court set forth the reasons and criteria for an informed consent. It followed the rationale of informed consent in other jurisdictions which have expressed the view that there is a contractual relationship between patient and physician in which the physician must conform his behavior to the decision of the patient. The Court quoted with approval from Robert E. Powell's article, Consent to Operative Procedures, 21 Md.L.Rev. 189, 191 (1961):

" 'In order to understand the nature of consent it is necessary at the outset to have some understanding of the legal relationship between the physician and his patient. This relationship is essentially contractual in nature. * * * More often than not the contract is raised by implication from the dealings between the parties, and in a like manner the acts to be performed by the parties are impliedly defined. * * * In short, the surgeon must operate in accordance with the agreement made between the parties. Consent for the operation or treatment arises from the contract and is given only in connection with what the parties understood was to be done * * *' " 423 Pa. at 156–157, 223 A. 2d 669.

The Pennsylvania Supreme Court indicated that a patient can make a decision only if he is told all of the consequences. Quoting again from the Powell article, the Court stated:

" '* * * [I]t will be no defense for a surgeon to prove that the patient had given his consent, if the consent was not given with a true understanding of the nature of the operation to be performed, the seriousness of it, and organs of the body involved, the disease or incapacity sought to be cured, and the possible results.' " 423 Pa. at 166, 223 A.2d at 674.

Once the patient has the information, he is the one to decide which of the possible consequences he wants to risk. The wisdom and fairness of the rule requiring a physician to disclose the possible adverse effects of surgery were explained in a more recent article, *Informed Consent in Medical Malpractice*, 55 Cal.L.Rev. at 1409, as follows:

"Since the patient bears the entire risk of non-negligent injury and is concerned with his own interest as no other person can be, it is only fair to allow him to choose between accepting or rejecting the hazards of a proposed treatment even if his choice is irrational."

In *Grunnagle*, the plaintiff testified that he understood the operation was to be an exploratory one and he would *thereafter* decide if he wished to undergo corrective surgery. The defendant

9. A line of cases has developed which limit a physician's duty of disclosure to the standards of the medical profession in the community. *E. g.*, Wilson v. Scott, 412 S.W.2d 299 (1967); Di Fillipo v. Preston, 53 Del. 539, 173 A.2d 333, 339 (1961). In Gray v. Grunnagle, there was testimony that the accepted standard of medical care in the area was to advise patients of the particular risks of the surgical procedure Mr. Gray was to undergo. 423 Pa. at 163, 223 A.2d at 672. In the present case, there is no testimony as to the community standard of disclosure; but neither party objects to this omission.

physician testified that although he advised Mr. Gray that the operation was "serious", he was not positive whether he explained the operation and its potential risks. 423 Pa. at 162, 223 A.2d 673. The Court said that the burden of proof was on the plaintiff to show that the operation was unauthorized, and that it was for a jury to decide whether under all the circumstances the plaintiff had sustained this burden and proved by a preponderance of the evidence that the consent was not informed.[10]

The charge on informed consent in the present case conformed to the Pennsylvania rule set forth in Gray v. Grunnagle. Judge Nealon's instructions indicated that a consent is valid only if it is "informed and knowledgeable". He said the physicians should have advised the decedent of the consequences of the operation as well as the alternative possibilities. The charge thus accurately reflected Pennsylvania law and was fair to the plaintiff.

■ We are also satisfied that there was sufficient evidence on the question of consent to warrant the submission of this issue to the jury. Mrs. Sipling had suffered from an enlarged thyroid for some time. She was sent to the defendants, specialists in thyroid surgery, specifically for surgery and was admitted to the hospital for that purpose. The physicians testified that they told her the operation was serious. They did not, however, according to their testimony, inform her of the percentage risk of death.[11] Although this omission can be a serious one, in the setting of this case it does not require us to hold as a matter of law that the defendants failed to discharge their burden of disclosure. In

Grunnagle, the Court did not direct a verdict for the plaintiff although the record indicates that the defendant physician may have failed to inform the patient of a 10 to 15% risk that he would be worse after the operation; instead the Court said whether there was an informed consent was a question for the jury.

■ Plaintiff also urges the position that because Drs. Wright did not advise the decedent of the alternative methods of treatment for thyroid the consent was not informed. Dr. F. W. Wright testified that in his opinion "surgery was the only method applicable to [Mrs. Sipling's] case." From this testimony the jury could well infer that there was *no* alternative. Dr. Carl E. Ervin, qualified as a medical expert, testified that Mrs. Sipling "had only one alternative and that was surgery. * * * If she had not been operated on, she would have died with mathematical certainty * * *." Disclosure of alternative treatment means disclosure of alternatives for the particular patient and not a recital of medical casebook theory. Mrs. Sipling had previously been treated with medication, and although the evidence is far from overwhelming it may properly be inferred that she was aware of this treatment and had found it unsatisfactory.

This brings us to plaintiff's second point on this appeal—the charge to the jury on the question of emergency was erroneous and the record is devoid of evidence from which the jury could conclude that any emergency did, in fact, exist.

■ It is well established that consent is not required for surgery if an

---

10. The Court in *Grunnagle* did not indicate what weight if any should be given to the signed hospital release form.

11. Fairness impels us to note the following testimony given by Dr. F. W. Wright which was damaging to defendants' case (N.T. 262):

"Q. Did you tell them that death was a possibility?
A. I do not accept death as a possi-

bility when I don't think it's going to happen.
Q. But death is one of the hazards when you operate on a very toxic patient, is it not, Doctor?
A. Well, if you consider one percent a hazard, I would say yes it is, but when you don't have any more than that you don't usually tell them they're going to die."

emergency exists and an immediate operation is needed to save the patient's life.[12] Plaintiff, however, contends that the trial judge did not properly define an emergency as "a sudden or unexpected event which creates a temporarily dangerous condition usually necessitating immediate or quick action"—a definition plaintiff takes from a case on an entirely different subject.[13] Although the trial judge did not define emergency, he explained the general principle of the emergency exception and told the jury that they would have to conclude that an *immediate* operation was necessary to save Mrs. Sipling's life or health, before this exception would be applicable.

The testimony in this case is meager on the existence of an emergency. Nonetheless, the trial judge was not required to rule as a matter of law that no emergency existed. This is particularly so in view of the affirmative reply by Dr. F. W. Wright to a question on cross-examination asking whether there was an emergency at the time he performed surgery.[14] On direct examination, Dr. F. W. Wright had explained that on February 6th, he concluded that the medication was losing its effectiveness on Mrs. Sipling and that if he did not operate then he might never have the chance again.

Dr. F. M. Wright agreed with his father's diagnosis that Mrs. Sipling was undergoing a change in response to medication. He also said it was his opinion that "if she hadn't been operated on she would have died." Dr. W. Emory Burnett, Professor of Surgery and Emeritus

Chairman at Temple University Hospital, indicated after reviewing the medical charts that Mrs. Sipling "was getting into [the] state where the drugs [could] not control her and she [would] slip further back into the severity of her disease". Dr. Burnett added, "it was the time to proceed now to interrupt this process by removal of an adequate amount of the thyroid gland."

Accordingly, the order of the District Court denying plaintiff's motions for judgment n. o. v. or a new trial will be affirmed.

SEITZ, Circuit Judge (concurring in part and dissenting in part).

I agree with the majority opinion to the extent that it affirms the order of the district court denying plaintiff's motion for a judgment n. o. v. I do so because I am satisfied that the evidence of informed consent, whether evaluated by the federal or Pennsylvania law standard, created an issue to be resolved by the jury.

However, contrary to the majority of the court, I think it was error for the district court to deny plaintiff's motion for a new trial. The majority's conclusion is premised on its determination that there was evidence which warranted the district court in giving the jury a charge on emergency. I cannot agree.

The evidence relied upon in the majority opinion as creating a jury issue as to emergency is the doctors' testimony that an emergency existed which required the operation be performed at that particular time. I accept that testimony as true; but under the undisputed facts of this

12. *E. g.*, Barnett v. Bachrach, 34 A.2d 626 (Mun.Ct.D.C.1943), and cases cited at note 1 *supra*. In Gravis v. Physicians and Surgeons Hospital of Alice, 427 S.W.2d 310 (Texas, 1968), cited by plaintiff, and Rolater v. Strain, 39 Okl. 572, 137 P. 96 (1913) the respective courts ruled that whether an emergency existed was a question for the jury.

13. Scaccia v. Old Forge Borough, 373 Pa. 161, 94 A.2d 563 (1953). Plaintiff's points for charge did not specifically request this definition of emergency.

14. "Q. There was no immediate emergency that required an operation on February 6th, 1964, was there, Doctor?
A. Yes, I just explained that, Mr. Markowitz. Her drugs had seemed to have lost their effectiveness, and if she is not operated on at that point, you delay this more and more and more, and you're very apt to have a patient that you never will be able to operate on." (N.T. 244).

case it did not establish an "emergency" which excused the need for an informed consent. Plaintiff's wife was in the hospital for a total period of over 30 days prior to the operation and no one questions the doctors' testimony that surgery was the only treatment contemplated from the date of her admission to the hospital. It is not disputed that two blank forms were signed by the plaintiff and his wife, respectively, consenting to an operation. Moreover, one of the defendants testified that he spoke to plaintiff about two days before the operation and told him that it would be done on "either of the following two days." The reality is that the defendants had procured a consent to the operation well before it was performed. This, then, is not a case which required that an operation be performed before a consent could be obtained. Merely because plaintiff thereafter denied that the consent was an informed one does not warrant a treatment of this case as though the events prior to the operation had not occurred.

I would therefore set aside the verdict and grant a new trial because the jury returned a general verdict and it is therefore not possible to say that the jury's verdict did not result from an unwarranted finding that there was an emergency which excused the need to procure an informed consent.