**Frank R. CICCARONE, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 43688.**

United States District Court, E. D. Pennsylvania.

Sept. 13, 1972.

N. Carl Schwartz, Merion, Pa. and Albert Dragon, Philadelphia, Pa., for plaintiff.

Barry W. Kerchner, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

HUYETT, District Judge.

This action tried without a jury charges medical doctors employed by defendant, United States of America, at the Coatesville Veterans Administration Hospital with malpractice in treating plaintiff, Frank R. Ciccarone, in July 1963. Defendant denies malpractice, and also asserts the affirmative defense of the statute of limitations. The trial was bifurcated. Only the issue of liability was tried.

## FINDINGS OF FACT

1. Plaintiff, Frank R. Ciccarone, is a resident of Philadelphia, Pennsylvania.

2. Defendant, United States of America, through its agents, servants and employees and through the Veterans Administration, an agency of defendant, at all times hereafter mentioned, operated a hospital at Coatesville, Pennsylvania.

3. Plaintiff in July of 1963 was a 39 year old white male.

4. Prior to July 1963 plaintiff had been employed as a "wood sawer" in the same factory since 1956.

5. Plaintiff had an eighth grade education and when examined by Dr. S. E. Strum gave the impression that he was intellectually restricted and had memory difficulties.

6. Plaintiff in every visit to a physician at all times hereinafter mentioned in connection with his medical problems was always accompanied by his wife, a person of average intelligence, who actively participated in all discussions and decisions.

7. While on duty with the U. S. Army in September 1945 plaintiff following an accident in which he was thrown out of a jeep developed acute meningitis and as a result was hospitalized until December 8, 1945.

8. From July 4, 1956 to July 16, 1956 plaintiff was hospitalized in the Philadelphia General Hospital for meningitis.

9. From December 23, 1961 to January 4, 1962 and from January 26, 1962 to January 29, 1962 plaintiff was hospitalized in the Misericordia Hospital for recurrent bacterial meningitis.

10. On May 8, 1963 plaintiff was admitted to the Veterans Administration Hospital, Coatesville, Pennsylvania (Veterans Administration Hospital) for observation and evaluation to determine the reason for recurrent meningitis and to determine a possible treatment to prevent future recurrences of meningitis.

11. Plaintiff, on May 8, 1963, because of his three previous attacks of meningitis, was faced with the possibility of death and he and his wife were so advised by the staff of the Veterans Administration Hospital.

12. Plaintiff was on leave from the Veterans Administration Hospital from June 28, 1963 to July 14, 1963.

13. In July 1963 Dr. S. E. Strum was a full-time staff neurologist at the Veterans Administration Hospital.

14. Dr. S. E. Strum served a medical residency at Worcester City Hospital where he spent three months attending and caring for neurological and neuropsychiatric patients; he trained in neurology for two years at the Boston Veterans Administration Hospital and for one year at the Bronx Veterans Administration Hospital, thereby completing three years of neurological training.

15. Plaintiff returned to the Veterans Administration Hospital on July 10, 1963 for evaluation at which time he was examined by Dr. S. E. Strum.

16. In 1963 plaintiff required a complete investigation to determine the cause of the repeated attacks of meningitis.

17. Since in 1963 plaintiff had fractures of the frontal sinus as well as fractures extending into the maxillary sinuses and because plaintiff had many attacks of sinusitis, it was essential at that time to consider the possibility of a cerebro-spinal fluid leak into the frontal sinus or other sinuses and to determine whether such leak was the source of the attacks of meningitis.

18. If the source of such infection could not be found at that time, the usual history of such patients was that death would occur in attacks of meningitis and therefore the determination of a cerebro-spinal fluid leak into the nasal cavity was entirely justified.

19. On July 10, 1963 Dr. S. E. Strum developed a careful and elaborate written plan to investigate the possibility of communication of the subarachnoid space and the outside to determine the reason for plaintiff's recurrent attacks of meningitis. Such plan included a detailed analysis and evaluation of plaintiff's condition.

20. Dr. Strum's plan of July 10, 1963, inter alia, involved an intrathecal injection of methylene blue (methylene blue procedure), other studies and tests, and presentation of the results to consultant physicians of the Veterans Administration Hospital.

21. Prior to implementing the methylene blue procedure Dr. S. E. Strum discussed his plan with other physicians at the Veterans Administration Hospital including Dr. Gigliotti, then a resident in neurology, and Dr. M. P. Rosenblum, then acting chief of neurology and concurrently Chief of Staff of the Veterans Administration Hospital.

22. Plaintiff, on July 10, 1963, was asked to return to the Veterans Administration Hospital on July 14, 1963.

23. On July 14, 1963, which was a Sunday, plaintiff and his wife discussed the methylene blue procedure with Dr. S. E. Strum who advised plaintiff and his wife substantially as follows:

"It appears that the recurrence of meningitis is caused by an infection reaching the spinal column from some external source. It is possible that such infection is communicated through the sinuses into the area where meningitis is found. In order to determine whether such communication exists, it is suggested that a methylene blue dye be injected into the spinal column and should the dye later appear on gauze nose packs, it would then be advisable to perform a corrective operation to block out communication and to prevent a recurrence of meningitis. Meningitis is a

serious infection and a history of three attacks elevates the need for corrective action. The diagnostic procedure suggested is one which I have performed before without adverse reactions. There are dangers inherent in any lumbar puncture, especially where a foreign substance is introduced into the body. The potential advantages under the circumstances seem to outweigh the potential dangers. There should not be any ill after effects and you can expect to be as normal as you presently are."

24. Plaintiff and his wife understood the explanation of Dr. S. E. Strum on July 14, 1963 concerning the proposed test procedure.

25. Following Dr. Strum's explanation of the methylene blue procedure, the plaintiff and his wife orally agreed and consented to have the procedure performed although no formal written authorization was obtained.

26. Prior to the injuries sustained in the Veterans Administration Hospital by plaintiff on July 16, 1963, plaintiff had virtually full use of his legs and normal bowel and urinary functions and sexual ability.

27. The most feasible method to determine a leak from the intra-cranial cavity into the nasal cavity was use of the methylene blue procedure.

28. Dr. S. E. Strum, in July 1963 in respect to plaintiff, was faced with the necessity of balancing the hazards of the methylene blue procedure, and the potentiality of death from an attack of meningitis.

29. Dr. S. E. Strum had participated in the intrathecal injection of methylene blue on at least two prior occasions without any adverse effects while serving at the Boston Veterans Administration Hospital.

30. The methylene blue procedure was taught to the staff of the Boston Veterans Administration Hospital at the time Dr. S. E. Strum trained there for a two-year period, and during such period no one at that hospital or at the asso-ciated teaching facilities of Harvard, Tufts or Boston University reported to the staff of the Boston Veterans Administration Hospital adverse effects from such procedure.

31. Dr. S. E. Strum, when he administered the methylene blue procedure on July 16, 1963, was unaware of any method to determine plaintiff's sensitiveness to methylene blue dye.

32. Dr. M. P. Rosenblum, in 1963, was certified by the American Board of Psychiatry and Neurology in the fields of both psychiatry and neurology.

33. Dr. M. P. Rosenblum concurred with the methylene blue procedure proposed by Dr. S. E. Strum for plaintiff.

34. In 1963 Dr. M. P. Rosenblum was not aware of any other commonly used tests in lieu of the methylene blue procedure proposed by Dr. S. E. Strum.

35. The methylene blue procedure proposed by Dr. S. E. Strum was essentially a diagnostic procedure.

36. Dr. Robert A. Groff of Philadelphia, Pennsylvania, is a physician who is Board certified in the fields of neurosurgery and neurology.

37. Dr. Robert A. Groff reviewed in detail the records of plaintiff at the Veterans Administration Hospital.

38. Dr. Robert A. Groff used the methylene blue procedure on three occasions at the University of Pennsylvania Hospital, the last in 1967.

39. There is no test to determine sensitivity to the use of the methylene blue dye in a methylene blue procedure.

40. The methylene blue procedure used by Dr. S. E. Strum on July 16, 1963 was a proper medical procedure and essential considering plaintiff's condition.

41. The methylene blue procedure was a necessary procedure to evaluate properly the reason for plaintiff's recurrent attacks of meningitis and to determine a possible program of treatment to prevent future attacks of meningitis.

42. On the morning of July 16, 1963, Dr. S. E. Strum performed a diagnostic

procedure consisting of the following: Plaintiff was placed on an operating table on his left side, with his knees drawn to his chest. Using a large syringe 25 c.c.s of cerebro-spinal fluid was removed from the subarachnoid space to which 2 c.c.s of methylene blue were added. The mixture was then reinjected slowly into the subarachnoid space; cotton gauze pads packed into the nostrils were expected to show traces of the methylene blue if in fact there was a communication between plaintiff's sinuses and the spinal column.

43. Plaintiff rested on the operating table for about 30 to 45 minutes following the final removal of the syringe. He then was helped off the operating table, stepped down to the floor, reached for his shoes, fell, and struck the bridge of his nose on the floor causing bleeding and a mild fracture of the left nasal bone.

44. At 4 P.M. on July 16, 1963 plaintiff complained of back pain at the site of the lumbar puncture, numbness of his legs, and said that he could not walk because of the pain.

45. At 9:45 P.M. on July 16, 1963 the nose packs were removed and there was no clear-cut evidence of methylene blue since the nose fracture had interfered with the methylene blue procedure.

46. On July 17, 1963 plaintiff was unable to stand or walk because of pain; he had a feeling of "heaviness" and a burning sensation from a circumscribed band below the lower rib cage approximately two and one-half inches in width extending to his toes; his lower extremities were flaccid; he could not lift his right or left foot and hold it against gravity.

47. On July 17, 1963 Dr. D. Carnecchia of the Veterans Administration Hospital made a report of plaintiff's condition in which he indicated that the most likely cause of plaintiff's condition at that time was chemical irritation.

48. On July 17, 1963 Dr. S. E. Strum in a written report indicated that several possible causes had to be considered in respect to plaintiff's condition: the activation of a loculated quiescent abscess; the nose trauma; anachroditis and a possible reactivation of a meningitis.

49. Plaintiff's wife visited plaintiff two days after the methylene blue procedure and was advised by Dr. S. E. Strum that he did not know for certain what had happened to cause the dramatic change in plaintiff's physical condition.

50. Dr. S. E. Strum on the occasion of the visit of plaintiff's wife did not advise her that plaintiff had sustained an attack of meningitis.

51. During the days following the methylene blue procedure on July 16, 1963, plaintiff and his wife both were aware of the following:

(a) The methylene blue procedure on July 16, 1963 caused an unexpected reaction.

(b) There was an immediate and dramatic concurrent change in plaintiff's physical condition following the lumbar puncture.

(c) There was no definite clear-cut explanation for the unexpected results.

(d) Hospitalization was necessary to permit physical therapy and further observation and evaluation.

52. Subsequent to July 16, 1963, Dr. M. P. Rosenblum told plaintiff that the staff of the Veterans Administration Hospital would do everything possible to aid him in his recovery but no absolute statement was made that plaintiff would have a complete recovery.

53. All personnel of the Veterans Administration Hospital treating plaintiff following the methylene blue procedure encouraged plaintiff toward making a full recovery in accord with accepted medical practices.

54. The doctors and personnel at the Veterans Administration Hospital believed that plaintiff would recover from his disabled condition following the methylene blue procedure.

55. On July 25, 1963, Dr. S. E. Strum spoke to Dominic S. Farnoly, a Veterans Administration claims representative, and explained various diagnoses that had been offered in respect to the unexpected results of the methylene blue procedure.

56. The personal treatment of plaintiff by Dr. S. E. Strum ceased on August 6, 1963.

57. The Veterans Administration on August 22, 1963 rated plaintiff 100% temporarily disabled from May 8, 1963 because of hospitalization; and 100% permanently disabled from July 16, 1963 because of myeloradiculitis associated with fracture of left nasal bone.

58. Dr. John K. Durkin who in 1963 was a full-time staff physician of the Veterans Administration Hospital began his treatment of plaintiff in September 1963 and noted in the hospital records that plaintiff was recovering from a July 1963 illness.

59. Dr. John K. Durkin noted an improvement in plaintiff's condition from September 15, 1963 to November 1963.

60. Dr. John K. Durkin never told plaintiff that he would have a complete recovery.

61. On October 17, 1963 plaintiff and his wife were advised of a recommendation of Dr. H. P. Harkins, a consultant of the Veterans Administration Hospital, that an antrostomy should be performed to prevent recurrence of maxillary sinusitis but plaintiff and his wife declined to proceed with this recommendation.

62. On November 1, 1963, plaintiff was discharged from the Veterans Administration Hospital and advised to continue physical therapy at home; various medications were prescribed and plaintiff was able to walk with the aid of a cane and had nearly normal use of his urinary and bowel functions.

63. Plaintiff continued to receive treatment from the Veterans Administration Hospital on a sporadic out-patient basis following his release on November 1, 1963; both plaintiff and his wife were aware that something had gone wrong with the methylene blue procedure immediately following its administration and questioned its propriety on various occasions prior to July 16, 1965.

64. Dr. R. A. Farmer of the Veterans Administration Hospital in 1964 was Board certified in both neurology and psychiatry.

65. Dr. R. A. Farmer was Chief of Neurology at the Veterans Administration Hospital from December 3, 1963 to date of trial.

66. Prior to becoming Chief of Neurology at the Veterans Administration Hospital, Dr. R. A. Farmer had been a consultant in neurology at the Veterans Administration Hospital for nine years.

67. Plaintiff was seen by Dr. R. A. Farmer at the Veterans Administration Hospital on March 11, 1964 at which time plaintiff's wife related and plaintiff corroborated that since the episode of July 16, 1963 plaintiff has been unable to achieve a penile erection or practice sexual intercourse.

68. On the same date when plaintiff was examined by Dr. R. A. Farmer, Dr. Farmer found that plaintiff was progressing satisfactorily and plaintiff stated that he felt better, had better use of his legs, more strength and could walk farther.

69. Dr. Joseph Robinson, of Philadelphia, Pennsylvania, examined plaintiff on November 30, 1964 at the request of C. Howard Harry, Jr., Esquire, of Norristown, Pennsylvania, in connection with an automobile accident in which plaintiff was involved on December 11, 1961.

70. Plaintiff told Dr. Joseph Robinson on November 30, 1964 that since July of 1963 at the Coatesville Hospital he became totally paralyzed from his waist down and was in that hospital for about six months.

71. Plaintiff told Dr. Joseph Robinson that following a procedure performed on him at Coatesville Hospital in July of 1963 he suffered paralysis of the legs.

72. Dr. Joseph Robinson when he examined plaintiff on November 30, 1964 found no residuals resulting from the December 11, 1961 automobile accident but found that plaintiff's complaints resulted from his previous attacks of meningitis as well as the procedure performed upon him at the Veterans Administration Hospital on July 16, 1963.

73. Dr. Bernard J. Alpers, a physician having an office in Philadelphia, Pennsylvania, is certified by the American Board of Psychiatry and Neurology in both the fields of psychiatry and neurology.

74. Dr. Bernard J. Alpers examined plaintiff on January 6, 1965 in connection with an automobile accident in which plaintiff was involved on December 11, 1961.

75. Dr. Bernard J. Alpers by letter dated July 6, 1965 directed to Dr. Donald Fox of Philadelphia, Pennsylvania, reported that plaintiff's present trouble began in July of 1963 while he was in the hospital at which time he developed weakness of the legs.

76. Dr. Bernard J. Alpers also reported to Dr. Donald Fox that plaintiff's damage had reached an irreversible stage and that he did not see how medical treatment could be of much help.

77. Dr. Bernard J. Alpers at the time of his neurological examination of plaintiff on January 6, 1965 discussed his findings with plaintiff and his wife.

78. Dr. Bernard J. Alpers was paid for his examination of plaintiff of January 6, 1965 by Arthur J. Hirschhorn, Esquire, who represented plaintiff in connection with the December 11, 1961 automobile accident.

79. Under date of January 7, 1965, plaintiff requested that the Veterans Administration Hospital supply a copy of his hospital records to Dr. Bernard J. Alpers.

80. On July 7, 1965, when Dr. R. A. Farmer met with plaintiff and his wife on an out-patient basis, the July 16, 1963 methylene blue procedure performed by Dr. S. E. Strum was discussed.

81. On July 7, 1965 Dr. R. A. Farmer told plaintiff that he was improving but he did not tell plaintiff that he would sustain a complete recovery.

82. When plaintiff and his wife met with Dr. R. A. Farmer on July 7, 1965, plaintiff and his wife told Dr. Farmer that they were dissatisfied with the method that Dr. S. E. Strum used in the methylene blue procedure and that since such procedure there has been a drastic change in plaintiff's physical condition.

83. Dr. R. A. Farmer on that date told plaintiff and his wife that the methylene blue procedure was an accepted procedure which had been performed for many years.

84. Plaintiff reported to Dr. R. A. Farmer on July 7, 1965 that the plaintiff occasionally had an erection during sleep.

85. Neither Dr. S. E. Strum nor any other physician of the Veterans Administration Hospital intentionally concealed any facts from plaintiff or his wife.

86. Plaintiff and his wife were never prevented by the staff of the Veterans Administration Hospital from obtaining knowledge of the facts of his case and particularly surrounding the methylene blue procedure administered on July 16, 1963.

87. On October 9, 1967 plaintiff was admitted to the Holy Redeemer Hospital, Philadelphia, Pennsylvania, where his condition was diagnosed as meningitis and he was placed on the critical list.

88. Dr. Aaron W. Mallin, the only expert medical witness who testified for plaintiff, is certified by the American Board of Psychiatry and Neurology only in the field of psychiatry.

## DISCUSSION

I. *Statute of Limitations*

The threshold issue is whether plaintiff's action is barred by the statute of limitations. Plaintiff underwent an intrathecal injection of methylene blue

which he claims constituted malpractice and caused him physical injury on July 16, 1963. He filed suit more than four years later on September 29, 1967. The statute of limitations on actions brought under the Federal Tort Claims Act is two years from the time the right of action first accrues. 28 U.S.C.A. § 2401.

 The crucial determination is when the cause of action accrued within the meaning of the statute. Federal law must be applied in making that finding. Quinton v. United States, 304 F.2d 234 (5th Cir. 1962). The best rule for determining when the statute begins to run is that the claim "accrues against the Government when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice." Hungerford v. United States, 307 F.2d 99, 102 (9th Cir. 1962); accord Coyne v. United States, 411 F.2d 987 (5th Cir. 1969).

Plaintiff cites various cases in which courts have permitted plaintiffs to maintain actions which were filed more than two years after the negligent action. These were generally cases in which the plaintiff could not know immediately that there was damage and, therefore, had no reason to suspect wrong-doing. See Quinton v. United States, supra; United States v. Reid, 251 F.2d 691 (5th Cir. 1958); cf. Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). The general rule as stated by the Fifth Circuit for the determination of when an action accrues is:

> "Where the trauma coincides with the negligent act and some damage is discernible at the time, the two-year statute of limitations begins to run even though the ultimate damage is unknown or unpredictable." Beech v. United States, 345 F.2d 872, 874 (5th Cir. 1965)

The facts of this case indicate that plaintiff's action accrued immediately.

There can be no doubt that the injury coincided almost exactly with the alleged wrongful act, the intrathecal injection of methylene blue. Plaintiff had pain and numbness in his legs within a few hours after the completion of the procedure. The next day he could not stand or walk and his lower extremeties were flaccid. He was aware that there were possible dangers with the procedure but that there should be no ill effects. The unexpected and unusual trauma immediately following the procedure should have alerted plaintiff to diligently investigate the matter. See Brown v. United States, 353 F.2d 578 (9th Cir. 1965). The three factors enumerated in Beech v. United States, supra—the trauma, the alleged negligent act and discernible damage—were all immediately present on July 16, 1963.

 Plaintiff argues that the statute should not be held to have run against him because he was lulled by the false statements of the doctors at the Veterans Administration Hospital. He claims that he was told by several doctors that his paralysis was due to a meningitis attack and was in no way related to the methylene blue injection. This Court, however, finds that Dr. Strum never told plaintiff or his wife that plaintiff's injuries were the result of a meningitis attack. The records from the hospital indicate that there was confusion as to the cause, and the testimony at trial confirmed that some confusion in the use of the term "meningitis" still exists. The doctor did not purposely deceive the patient. It was not the duty of the doctors treating plaintiff to advise him that he had been negligently treated. See Brown v. United States, supra. Plaintiff's inquiries to the doctors were not very diligent in nature. It should be noted that during the period in which plaintiff claims the statute was not running he was in contact with counsel concerning another matter and during such period he was twice examined by non-government doctors, Drs. Robinson and Alpers, both of whom gave consideration to plaintiff's July 16, 1963 injuries.

 Plaintiff also argues that the statute was stopped because he was un-

der continuous care of Veterans Administration doctors. It is clear that Dr. Strum's care of plaintiff ceased entirely in August, 1963. The continuous care rule is limited to the personal physician-patient relationship and a patient is not excused from diligent inquiry because he continues to be treated by succeeding government doctors. See Brown v. United States, *supra*.

■ Plaintiff's claim that he was lulled by the doctors' assurances that he would recover completely is without legal or factual support. If plaintiff suffered even temporary damage from a wrongful act he suffered damage which gave rise to a claim. Knowledge of ultimate damage is not necessary for the running of the statute. Beech v. United States, *supra*. There was no indication on the part of the hospital staff that this was an ordinary and temporary result of such a test upon which assurance plaintiff might be permitted to rely. Compare, Toal v. United States, 438 F. 2d 222 (2d Cir. 1971). In *Toal* there was the added complication that plaintiff was injured in an intervening automobile accident before the damage from the malpractice manifested itself.

■ . Plaintiff in the present case was clearly on notice that he had suffered injury immediately after the procedure. He should have diligently investigated the possibility that rights had accrued to him and not have waited four years to file suit. The statute of limitations has run.

II. *Malpractice*

■ Notwithstanding our conclusion that the statute of limitations has run we shall also discuss plaintiff's claim that there was medical malpractice. Plaintiff's main contentions are (1) that he did not give an informed consent because Dr. Strum did not properly warn him of the dangers of the procedure, and (2) that the performance of the procedure itself was malpractice. Pennsylvania law governs this action brought under Federal Tort Claims Act. See

Christopher v. United States, 237 F. Supp. 787 (E.D.Pa. 1965).

*(A) Informed Consent*

■ In Pennsylvania a patient must give an informed consent to any medical procedure which is performed on him. This means that he must know of the possible adverse results and dangers of the procedure. The doctor may also be required to inform the patient of any alternative methods of treatment for his particular case. See Dunham v. Wright, 423 F.2d 940 (3d Cir. 1970).

Plaintiff claims that neither he nor his wife were properly informed of the possible consequences of the methylene blue injection. Mrs. Ciccarone testified that Dr. Strum told her and her husband that there were no dangers from the procedure. Dr. Strum, however, testified that although he could not remember exactly what he said nine years ago, he was certain that he warned the Ciccarones that death and paralysis were always possibilities in a lumbar puncture, and that this possibility was increased when a foreign substance was injected into the body. We accept Dr. Strum's testimony.

The fact that Dr. Strum could not remember exactly what he said during his conference with the Ciccarones does not convince us to accept Mrs. Ciccarone's testimony. His lapse of memory after nine years is understandable. He testified as to what was his custom at the time and we are convinced that he followed that practice in this case.

Dr. Strum admitted that he did not stress possible ill-effects to plaintiff and that he told the patient that harm was unlikely. This was reasonably based on his own experience and education. He reasonably explained the possible benefits of the procedure and the dangers to the patient if the source of his meningitis attacks were not discovered. We cannot place a doctor in the position of talking a patient out of treatment which he reasonably believes to be necessary and safe. As Judge Adams stated in *Dunham* courts must

". . . develop a delicate balance between the right of the patient to choose the treatment which he wishes to undergo and the freedom of the physician to practice responsible and progressive medicine without fear of frequent litigation." 423 F.2d at 942

Dr. Strum did not inform the plaintiff of any alternative method for obtaining the information which he considered so essential to treatment of plaintiff's condition. While Dr. Mallin, plaintiff's expert, testified that other methods were available, the other doctors who testified indicated that this was unclear. Dr. Mallin's testimony was undercut by testimony of Dr. Groff, defendant's expert, that procedures which Dr. Mallin had named were improper for the purpose in this case.

■ We find that plaintiff's consent to this procedure was informed. He knew of the possible consequences and benefits to him. Dr. Strum had not emphasized the dangers on the basis of his own experience and education. The fact that he did not give a percentage breakdown of the risk is not decisive. Dunham v. Wright, supra at 946. We believe that Dr. Strum's discussion with plaintiff and his wife struck a reasonable balance between the right of the patient to be properly informed and the right of the doctor to practice responsible medicine without harassment.

### (B) Performance of the Procedure

Plaintiff also contends that it was malpractice for Dr. Strum to perform the procedure because he had not researched the literature which indicated that there might be dangers to the intrathecal injection of methylene blue. Dr. Strum testified that he based his decision to use methylene blue on his own participation in two previous intrathecal injections which were completed without any complications, on the teaching he had received concerning this procedure at the Boston Veterans Administration Hospital, and his own familiarity with neurological literature. He admitted that he had not researched the subject in the Index Medicus, a basic medical source for finding articles in the field of medicine. He was not familiar with two articles, warning of possible dangers in this procedure, which appeared in the Journal of the American Medical Association in 1960.

■ Plaintiff contends that Dr. Strum's failure to properly research the subject before performing the procedure was a breach of medical practice which resulted in him using a dangerous procedure which caused plaintiff's injuries. In malpractice actions in Pennsylvania the test is whether the physician possessed and employed in the treatment of the patient the skill and knowledge usually possessed by physicians of similar position in the same locality, giving due regard to the advanced state of the profession and whether he exercised the care and judgment of a reasonable man. McHugh v. Audet, 72 F.Supp. 394, 399 (E.D.Pa. 1947). Plaintiff must prove that the doctor failed to satisfy these criteria and that the failure caused the injuries. We find that Dr. Strum's failure to research the literature was not malpractice which caused plaintiff's injuries. Dr. Strum had previous experience on two occasions with the exact procedure in question. He had been taught the procedure at the Boston Veterans Administration Hospital, a facility which was associated with the medical schools of Harvard, Tufts and Boston Universities, and had not been told of any unusual adverse effects. His own study of the neurological literature and journals had not disclosed any unfavorable mention of this procedure.[1] The procedure was not new to him and there was nothing to indicate to him any unusual danger. Dr. Robert Groff testified that given Dr. Strum's particular

---

I. Dr. Robert Groff, defendant's expert who is Board certified in neurology and neurosurgery, testified that it was not good practice to put articles such as those in this case in the Journal of the American Medical Association since the interested parties, neurologists, are more likely to see them in neurology journals.

circumstances he did not believe that Dr. Strum had to research the literature in order to conform to good medical practice.

Even if Dr. Strum had researched the literature there is a serious question whether he would have felt restrained from using the procedure. Against the reports in the articles that there had been serious complications in some cases he had his own experience and his teaching. Dr. Groff testified that he did not believe that the articles in any way proved that methylene blue was the cause of the injuries reported. His own conclusion was that they were probably allergic responses to the chemical. He criticized an experiment used by one of the authors, Dr. Evans, in which methylene blue was injected into dogs on the grounds that too large a dose was used and dogs might not have been the best animals. Dr. Groff testified that he knew of the articles in 1960 but continued to use the procedure until 1967, at which time he began to use a newer, safer method. It would appear from this testimony that even if Dr. Strum had read the articles, weighed them against his experience, learning and their inconclusiveness, he could have performed the procedure in accordance with good medical practice in Philadelphia in 1963. We cannot say that his failure to research the literature was the cause of the unfortunate injuries to plaintiff.

Plaintiff's claim that it was malpractice not to test him for sensitivity to the drug is also rejected. He did not prove that such a test was possible. Plaintiff's expert, who never had any experience with methylene blue, asserted that it was possible. The other doctors who testified said that they were not aware of any method for testing sensitivity to this particular drug. Dr. Mallin's unsupported claim does not satisfy this Court, particularly since he did not indicate that he had experience with such testing.

## CONCLUSIONS OF LAW

1. This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2401(b), and 2671.

2. Plaintiff at the time of institution of this action resided within the jurisdiction of this Court.

3. The complaint was filed September 29, 1967 and served on the United States Attorney on October 12, 1967.

4. This action is barred by the Federal Tort Claims Act, 28 U.S.C. § 2401(b) which provides for a two-year period of limitations.

5. The Federal Tort Claims Act statute of limitations is jurisdictional and not merely procedural. As a statute of creation it limits the remedy which must be pursued within the specified time limit.

6. The period of limitations commences to run from the date of injury or at the latest the date plaintiff is aware of the act.

7. Plaintiff's cause of action accrued on July 16, 1963 when the act, injuries, and concomitant damages all simultaneously occurred in a traumatic fashion.

8. The two-year statute of limitations under the Federal Tort Claims Act began to run immediately upon the accrual of plaintiff's cause of action, i. e. on July 16, 1963.

9. The continuous treatment theory is not applicable.

10. Plaintiff reasonably could be expected to associate the injurious consequences with the methylene blue procedure, both of which occurred at substantially the same time, since the injury was not an expectable consequence of the procedure.

11. The methylene blue procedure utilized to diagnose the source of plaintiff's meningitis in July 1963 was a standard medical procedure in the Coatesville, Pennsylvania area of the average neurologist possessing that degree of skill, learning and care normally possessed by the average physician de-

voting special study and attention to the field of neurology.

12. Taking into consideration both the hazards of the methylene blue procedure and the potentiality of dying from an attack of meningitis, the methylene blue procedure as administered to plaintiff was not an improper procedure and did not constitute negligence. The determination of a cerebro-spinal fluid leak into the nasal cavity was entirely justified.

13. There was no negligence on the part of defendant acting through its agents, servants and employees and through the Veterans Administration, an agency of the defendant, in respect to the administration to plaintiff of the methylene blue procedure on July 16, 1963 or in the treatment accorded plaintiff.

14. Judgment is entered in favor of defendant and against plaintiff on the issue of liability.